PABST BREWING COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pabst Brewing Co. v. Commissioner
Docket No. 18466-92
United States Tax Court
T.C. Memo 1995-239; 1995 Tax Ct. Memo LEXIS 241; 69 T.C.M. (CCH) 2773; June 1, 1995, Filed *241 Pursuant to an agreement between P and H, H acquired a majority of P's shares in a public tender offer. P then distributed certain assets to H in exchange for the P shares acquired by H and the assumption by H of certain liabilities. In cross-motions for partial summary judgment, R asserts that the transaction constitutes a redemption under sec. 311(d)(1), I.R.C. 1954, while P asserts that the transaction constitutes a sale under sec. 1001, I.R.C. 1954. P also objects to the admissibility of certain evidence submitted by R relating to the valuation of the distributed assets, and asserts that no genuine issue exists as to the fair market value of the distributed assets. 1. Held: The transaction, in both form and substance, is a redemption governed by sec. 311(d)(1), I.R.C. 1954, rather than a sale under sec. 1001, I.R.C. 1954. 2. Held, further, P's objection to the admissibility of the valuation evidence submitted by R is overruled. 3. Held, further, a genuine issue of material fact exists with respect to the fair market value of the distributed assets, and summary judgment on that issue is denied. For petitioner: William M. Bitting. For respondent: *242 Alan M. Jacobson, Steven R. Guest, and Michael J. Calabrese. HAMBLEN
HAMBLEN
MEMORANDUM OPINION HAMBLEN, Chief Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax as follows: Taxable Year
Additions to tax
Ended
Deficiency
Sec. 6661
12/31/81 [1]
$ 58,241
--   3/18/83 [1]
28,188,661
$ 4,167,682
3/19/83
28,188,661
4,167,682
12/31/83
2,483,904
620,976
12/31/84
2,953,841
--   2/28/85
234,115
58,529
*243 Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the taxable years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure. This case is before the Court on the parties' respective cross-motions for partial summary judgment under Rule 121. In addition, petitioner has filed an objection to the admissibility of certain evidence submitted by respondent. The parties' cross-motions relate to the proper tax treatment of a transaction between Pabst Brewing Co. (petitioner or Pabst) and G. Heileman Brewing Co., Inc. (Heileman). The relevant portion of the transaction consisted of two general steps: (i) The acquisition by Heileman of a controlling interest in the common stock of petitioner pursuant to a public tender offer, and (ii) the distribution by petitioner of certain assets (the Transferred Assets) to Heileman in exchange for the surrender by Heileman of the Pabst stock it had acquired in the public tender offer, as well as other consideration. Both petitioner and respondent agree that the transaction constitutes a taxable event on which petitioner must recognize gain. The parties' disagreement centers on *244 the proper characterization of the transaction for Federal income tax purposes and the resulting method for calculating petitioner's tax liability. Respondent, in her motion for partial summary judgment, contends that the transaction is a redemption governed by the recognition rules of section 311(d)(1). [1] As a result, respondent asserts, petitioner's gain from the transaction is to be measured by the fair market value of the Transferred Assets distributed by petitioner to Heileman. Respondent further asserts that a trial is necessary to determine the fair market value of those assets. In contrast, petitioner contends that the transaction is a sale governed by the rules of section 1001. As a result, petitioner asserts that the gain from the transaction should be measured by the fair market value of the stock and other consideration *245 it received from Heileman, rather than the fair market value of the Transferred Assets it distributed to Heileman. Petitioner further asserts that, even if we agree with respondent that the transaction is a redemption, no genuine issue of material fact exists as to the fair market value of the Transferred Assets, and petitioner's valuation of those assets is correct as a matter of law. The issues for decision are: (1) Whether the transaction is a redemption governed by the recognition rules of section 311(d)(1), as respondent contends, or a sale governed by the rules of section 1001, as petitioner contends; and (2) in the event we hold that the transaction constitutes a redemption governed by the recognition rules of section 311(d)(1), whether a genuine issue of material fact exists as to the fair market value of the Transferred Assets. For the reasons set forth below, we agree with respondent that the transaction constitutes a redemption under section 311(d)(1) and that there is a genuine issue of material fact as to the fair market value of the Transferred Assets. In reaching this decision, we overrule petitioner's objection to the admissibility of certain evidence submitted *246 by respondent. Background
The facts set forth below are based on the stipulation of facts and attached exhibits submitted by the parties, as well as the affidavits submitted by the parties. These facts are stated solely for the purpose of deciding the issues before us. Petitioner's principal place of business was located in Mill Valley, California, at the time its petition was filed in this case. The primary participants in the transaction at issue were petitioner, Heileman, and Olympia Brewing Co. (Olympia). At the time of the transaction, all three companies were principally engaged in the production and sale of malt beverages. Prior to the completion of the transaction in March 1983, petitioner produced several brands of beer and malt liquor, and had brewing facilities in Wisconsin, New Jersey, Georgia, and Oregon. The transaction was the culmination of a series of events beginning several years earlier and involving several other participants. In order to help explain our resolution of the issues before us, we first summarize those earlier events. JMSL, the Jacobs Group, and the 1982 Proxy Contest
In late 1981, petitioner's management began exploring several *247 alternatives for providing its stockholders with a means of realizing the underlying asset value of their investment in petitioner. During the last quarter of 1981, the price of petitioner's stock fluctuated between $ 11.75 and $ 15.75 per share. Throughout this period, several individuals and companies sought control of petitioner through various means, including hostile takeovers, tender offers, and proxy contests. One potential acquirer, JMSL Acquiring Corp. (JMSL), was formed by Irwin L. Jacobs (Jacobs), Dennis M. Mathisen (Mathisen), Daniel T. Lindsay, and Gerald A. Schwalbach (collectively, the Jacobs Group). The Jacobs Group began making substantial purchases of petitioner's stock in November 1980 and, by October 1982, it held nearly 14 percent of petitioner's shares then outstanding. Because it wanted to obtain total control of petitioner, in early 1982 the Jacobs Group and its designees (collectively, the Dissident Group) announced a decision to initiate a proxy battle at Pabst's 1982 annual meeting of shareholders, scheduled for April 1982. In anticipation of that annual meeting, petitioner's incumbent management and JMSL (through a group called the "Shareholders' *248 Committee to Revitalize Pabst") proposed competing slates of nominees for election to petitioner's board of directors and solicited proxies from petitioner's shareholders. This proxy contest generated substantial litigation between the respective parties. Ultimately, the Dissident Group's effort to unseat the incumbent management was unsuccessful. At petitioner's 1982 annual meeting on April 13, 1982, the incumbent directors received approximately 54 percent of the votes cast, and the Dissident Group received approximately 46 percent of the votes cast. Early Contacts With Heileman
In May 1982, Heileman began exploring the feasibility of a business combination with petitioner. Meetings were held with representatives of the U.S. Department of Justice (Justice Department) concerning the antitrust aspects of the proposed combination. At the time, Heileman was still subject to a 1973 consent decree with the Justice Department that prevented Heileman from acquiring any brewing concern in an eight-State area of the Midwest. On May 28, 1982, Heileman announced its intent to acquire petitioner in a merger transaction at $ 24 in cash per share. However, 4 days later petitioner *249 issued a statement declaring: our contacts to date with the Justice Department lead us and our counsel to conclude that the Justice Department would not permit a Pabst-Heileman combination. Heileman is subject to an antitrust consent decree which would prevent Heileman from acquiring Pabst unless the antitrust authorities or a federal court affirmatively approves the transaction. The antitrust barriers appear to make such a transaction highly unlikely of consummation.
On June 14, 1982, the Justice Department announced that it would oppose the proposed acquisition of petitioner by Heileman. Agreement Between Petitioner and Olympia
At the same time that these initial contacts between Heileman and petitioner were taking place, representatives of petitioner and Olympia were discussing a business combination of their two companies. Petitioner believed that a combination with Olympia would make good business sense and, at the same time, allow petitioner to effect a recapitalization so that its shareholders could realize cash or cash equivalents for their shares. On June 2, 1982, petitioner, through its wholly owned subsidiary PBC Corp. (PBC), commenced a cash tender *250 offer for 1,270,000 Olympia shares at $ 26 per share (the PBC Offer). Eight days later petitioner and PBC entered into a definitive agreement with Olympia providing for a business combination. Pursuant to the terms of that agreement, the price of the PBC Offer was increased to $ 28 per Olympia share in cash. PBC subsequently purchased 1,270,000 Olympia shares. The second step of the proposed Pabst-Olympia combination, if approved by Olympia shareholders, was to take place as soon as practicable and was to involve a transaction in which those Olympia shares not purchased pursuant to the PBC Offer would be exchanged for securities and/or cash having a fair market value of not less than $ 26 per Olympia share. The First JMSL Offer and Olympia's Counter-Offer
On June 23, 1982, the Jacobs Group, through JMSL, commenced a tender offer for all of the outstanding shares of petitioner (the First JMSL Offer) at $ 24 per share if petitioner and PBC terminated the then-outstanding PBC Offer for Olympia shares, and at $ 22 per share if the PBC Offer was not terminated. Prior to making the First JMSL Offer, JMSL had entered into a "put" agreement with Heileman (the Heileman Put Agreement). *251 The put agreement provided that, if JMSL was able to elect a majority of petitioner's directors, Heileman would purchase, at JMSL's option, petitioner's New Jersey and Georgia brewing facilities together with an exclusive license to produce and market all of petitioner's brands in a 27-State area. In response to the First JMSL Offer, Olympia, through its wholly owned subsidiary OBC Acquisition, Inc. (OBC), commenced a competing offer to purchase 4 million shares of petitioner, constituting approximately 49 percent of petitioner's then-outstanding shares, at $ 25 per share in cash (the OBC Offer). Each of the Pabst shares not purchased for cash pursuant to the OBC Offer was to be exchanged pursuant to a merger for 1 share of a new class of convertible preferred stock of a combined Pabst/Olympia entity. On July 22, 1982, the U.S. District Court for the District of Delaware issued preliminary injunctions enjoining both the First JMSL Offer and the OBC Offer. On the same day, the Justice Department announced in a press release that it would oppose the First JMSL Offer because the proposed sale of certain assets to Heileman pursuant to the Heileman Put Agreement raised serious antitrust *252 concerns. In particular, the Justice Department was concerned that the splitting of Pabst brands would create an inherent interdependence between substantial competitors. In addition, the Justice Department's Antitrust Division concluded that the long-term viability of the surviving Pabst entity was unlikely, based on a review of its financial structure and business prospects. On July 23, 1982, JMSL terminated the First JMSL Offer and, 3 days later, OBC terminated the OBC Offer. Dissident Group's Solicitation of Consents
After the termination of the First JMSL Offer and the OBC Offer, Jacobs and Mathisen met with William F. Smith, Jr., Pabst's president and chief executive officer (Smith), and one of Pabst's distributors to discuss the demands of the Jacobs Group including, among other things, a possible restructuring of petitioner's board of directors. These negotiations were unsuccessful and, on August 31, 1982, members of the Dissident Group announced that they would seek removal of the incumbent Pabst board and attempt to replace them with the Dissident Group nominees by soliciting written consents from owners of a majority of the outstanding Pabst shares. The Dissident *253 Group's consent materials stated that, if the Dissident Group's nominees were elected as directors, they would use every effort to implement, as soon as practicable, a cash tender offer by Pabst to redeem its own shares at $ 23 per share. On September 20, 1982, the Dissident Group delivered written consents to petitioner, purportedly from a majority of petitioner's shareholders, authorizing the removal of its incumbent directors and election of the Dissident group nominees in their place. The U.S. District Court for the District of Delaware, however, held that the Dissident Group's solicitation materials violated Federal securities laws, that the written consents obtained by the Dissident Group were of no legal effect, and that the incumbent board of directors remained the duly constituted board of petitioner. See Pabst Brewing Co. v. Jacobs, 549 F. Supp. 1068 (D. Del. 1982). Second JMSL Offer, Agreement in Principle, and First HBC Offer
On October 27, 1982, JMSL commenced another tender offer (the Second JMSL Offer) pursuant to which JMSL sought to purchase up to 3 million Pabst shares for $ 24 per share in cash. At the time, Pabst shares *254 were trading on the New York Stock Exchange at approximately $ 20. If successful, the tender offer would have given JMSL a sufficiently large block of stock to control Pabst. At the time of the Second JMSL Offer, JMSL was owned by a Delaware holding company, PST Acquiring Corp. (PST), which itself was owned 50 percent by the members of the Jacobs Group and 50 percent by Paul Kalmanovitz (Kalmanovitz). In response, petitioner and Heileman entered into an agreement in principle, dated November 5, 1982, and amended on November 9 and 26, 1982 (the Agreement in Principle), which eventually culminated in the transaction at issue. As originally drafted, the Agreement in Principle contemplated the following transactions: (i) The acquisition by Heileman of Pabst and Olympia in a merger transaction, (ii) the retention of certain Pabst and Olympia assets by Heileman, (iii) and the spinoff of the remaining Pabst and Olympia assets to the former Pabst and Olympia shareholders. As an initial step under the Agreement in Principle, Heileman, through its wholly owned subsidiary HBC Acquisition, Inc. (HBC), commenced a competing tender offer (the First HBC Offer) on November 10, 1982, pursuant *255 to which HBC sought to purchase up to 5,500,000 Pabst shares for $ 27.50 per share in cash. As a further response to the Second JMSL Offer, petitioner's board of directors determined that the $ 24 per share price contained in the offer was inadequate and not in the best interests of petitioner or its shareholders. This decision was based, in part, on the opinion of petitioner's investment banker that: (1) The $ 24 offering price did not fully represent or reflect the value of a control position in petitioner, and (2) the transactions contemplated by the Agreement in Principle, including the First HBC Offer, were superior to the Second JMSL Offer and the possible second-step merger involving Pabst proposed by JMSL. The First HBC Offer and the Second JMSL Offer spawned extensive litigation among the interested parties. See, e.g., Pabst Brewing Co. v. Kalmanovitz, 551 F. Supp. 882 (D. Del. 1982); Jacobs v. G. Heileman Brewing Co., 551 F. Supp. 639 (D. Del.), affd. without published opinion 707 F.2d 1392 (3d Cir. 1982). On November 17, 1982, the District Court preliminarily enjoined JMSL, PST, *256 the Jacobs Group, and Kalmanovitz from consummating the Second JMSL Offer unless additional disclosures were mailed by JMSL to Pabst's shareholders. In response, JMSL mailed to Pabst's shareholders an Amendment to the Second JMSL Offer, dated November 18, 1982, purporting to make the additional disclosures ordered by the District Court and increasing the price to $ 30 per share for the 3,000,000 shares JMSL was seeking in its tender offer. On November 23, 1982, JMSL announced that it had increased the Second JMSL Offer price from $ 30 to $ 35 per share. The offer prices were increased on the understanding that Kalmanovitz would increase his participation in the transaction. On November 24, 1982, the District Court denied the motion of the Jacobs Group and Kalmanovitz for a preliminary injunction against the First HBC Offer. The Justice Department Consent Decree
On November 22, 1982, the Antitrust Division of the Justice Department filed a civil antitrust suit against Heileman and petitioner, a stipulation, and a proposed final judgment (the 1982 Consent Decree) in the U.S. District Court for the District of Delaware. See United States v. G. Heileman Brewing Co., 563 F. Supp. 642 (D. Del. 1983). *257 The complaint alleged that if Heileman were to acquire and exercise control over petitioner and Olympia by purchasing Pabst shares in the First HBC Offer, the First HBC Offer might substantially lessen competition in the U. S. beer industry. The Justice Department wanted to ensure that the spinoff of certain Pabst and Olympia assets to parties unrelated to Heileman, as called for by the Agreement in Principle, would be consummated. After reviewing the proposed 1982 Consent Decree to determine whether it was in the public interest, the District Court approved and entered it. Under the terms of the 1982 Consent Decree, Heileman represented that it intended to acquire only certain assets of Pabst and Olympia, and that it did not intend to acquire or exercise control over any other assets. Moreover, paragraph IV.A of the decree provided as follows: A. Until the appointment of a trustee under this Final Judgment, Heileman shall be free to vote in any manner the stock of Pabst, subject to * * * [the Justice Department's] prior approval. Heileman shall not otherwise manage or control Pabst or Olympia in any manner directly or indirectly. Furthermore, Heileman shall not have access *258 to any confidential business information, data or records of Pabst or Olympia concerning the Non-Retained Assets. Heileman shall have access to confidential business information, data and records of Pabst and Olympia concerning the Retained Assets; provided, however, that such access shall only take the form of the submission of written material to Heileman by Pabst and Olympia (unless * * * [the Justice Department] specifically agrees otherwise) and provided further that * * * [the Justice Department] shall be furnished with copies of all materials furnished to Heileman at the same time as such materials are furnished to Heileman.
Settlement With the Jacobs Group
On November 24, 1982, HBC amended the First HBC Offer by decreasing the number of Pabst shares sought to 4,250,000. As a result, Jacobs believed that the First HBC Offer would succeed and that he might be shut out of that offer's proration pool. That afternoon, Jacobs telephoned Heileman's president, Russell G. Cleary (Cleary), in order to discuss the terms of a possible settlement. Jacobs told Cleary that JMSL would withdraw from the bidding for Pabst shares in exchange for payment of its legal and related *259 expenses in the amount of $ 7,500,000. On November 26, 1982, Heileman, HBC, petitioner, and the Jacobs Group announced a settlement, with the Jacobs Group breaking off its relationship with Kalmanovitz and supporting a new HBC tender offer. Pursuant to the settlement agreement (the Settlement Agreement), the members of the Jacobs Group agreed to cease their participation in the Second JMSL Offer, and HBC agreed to terminate the First HBC Offer and to commence a new tender offer at $ 29 per Pabst share (the Second HBC Offer). The Settlement Agreement provided that the members of the Jacobs Group would tender their Pabst shares, which numbered approximately 1,140,000 (the Jacobs Group Shares), into a Second HBC Offer. The Jacobs Group also granted to petitioner an option to purchase all of the Jacobs Group Shares not purchased in the Second HBC Offer or sold by the Jacobs Group prior to the exercise of the option. The Settlement Agreement contained several other provisions. For example, the Jacobs Group agreed that for a period of 5 years none of its members, nor any affiliate of any member, would make any offer to purchase or otherwise acquire any shares of petitioner, HBC, Olympia *260 or any affiliate or successor to those corporations. The parties to the Settlement Agreement agreed to take all steps necessary to terminate with prejudice most of the litigation pending between them. As long as no Jacobs Group Shares were withdrawn from the Second HBC Offer, the Jacobs Group was entitled to a cash payment of $ 7,500,000 for its legal and related expenses, with the cost to be split equally between Heileman and petitioner. In addition, petitioner agreed to pay a portion of the Jacobs Group's legal and related expenses in order to settle the ongoing litigation. Kalmanovitz refused to join in the Settlement Agreement. The Successful Second HBC Offer and the Kalmanovitz Offer
Pursuant to the Settlement Agreement, HBC terminated the First HBC Offer on November 30, 1982, and, 2 days later, commenced the Second HBC Offer. The offer was made for 3,750,000 Pabst shares at $ 29 per share, with HBC reserving the right to purchase up to 5,600,000 at that price. JMSL terminated the Second JMSL Offer the next day. On December 6, Paul and Lydia Kalmanovitz, through their corporation 21-115, Inc., commenced a tender offer for 4,150,000 Pabst shares at $ 32 per share *261 (the Kalmanovitz Offer). The Kalmanovitz Offer provided that if 4,150,000 Pabst shares were purchased pursuant to the tender offer, the remaining stockholders would receive subordinated notes of Pabst with a principal amount of $ 26, bearing 15 percent annual interest. Kalmanovitz and another company owned and controlled by him also brought an action in District Court challenging the Second HBC Offer and the settlement of litigation involving Heileman, Pabst, and the Jacobs Group. See Kalmanovitz v. G. Heileman Brewing Co., 595 F. Supp. 1385 (D. Del. 1984). The court denied Kalmanovitz's motion for injunctive relief. HBC amended the Second HBC Offer on December 10, 1982, increasing the number of Pabst shares sought to 5,600,000. Five days later HBC again amended the offer, increasing the price to $ 32 per share. On December 22, 21-115, Inc., raised the price in the Kalmanovitz Offer to $ 40 per Pabst share and increased to 18 percent the annual interest rate on the proposed subordinated notes. As of December 22, 1982, the deadline for withdrawal under the Second HBC Offer, approximately 6,700,000 Pabst shares remained tendered to HBC. The next *262 day HBC accepted for payment 5,600,000 Pabst shares at a price of $ 32 per share, thereby successfully completing the Second HBC Offer. The total purchase price of the shares equaled $ 179,200,000. The Kalmanovitz Offer was terminated on December 28, 1982. Thereafter, Kalmanovitz filed two lawsuits seeking damages against Heileman, Cleary, Pabst, Smith, HBC, and the Jacobs Group. Details of the Transaction at Issue
Following the successful completion of the Second HBC Offer, and pursuant to the previously executed Agreement in Principle, petitioner entered into numerous agreements with Heileman, HBC, PBC, and Olympia, including an Acquisition Agreement, dated December 30, 1982, and amended February 24, 1983 (the Acquisition Agreement). The transaction that actually occurred as a result of these agreements differed in form from the transaction originally contemplated by the Agreement in Principle. The following diagram facilitates an understanding of the transaction that actually occurred: [SEE ILLUSTRATION IN ORIGINAL] Under the original Agreement in Principle, Heileman was to obtain the assets it desired through a merger with Olympia and Pabst, and was to spin off *263 the unwanted assets to unrelated parties. Under the Acquisition Agreement, which reflects the transaction actually carried out, Heileman did not merge with Olympia or Pabst. Instead, Olympia merged into Pabst, and the merged entity (petitioner) distributed certain assets to Heileman "in exchange for" all of Heileman's shares of HBC, whose sole asset was the Pabst stock acquired in the successful tender offer. [2] The Pabst stock held by HBC was then canceled. The following assets were distributed to Heileman pursuant to the transaction: (i) The Pabst brewing facility at Pabst, Georgia; *264 (ii) the Pabst brewing facility at Portland, Oregon; (iii) the Blitz-Weinhard, Henry-Weinhard, Blitz economy, Red, White & Blue and Burgermeister beer brands and all related light products; (iv) 100,000 kegs in addition to kegs included as part of the brewing facilities; (v) $ 10,000,000 in surplus assets; (vi) the Pabst office building and related parking areas in Milwaukee, Wisconsin; (vii) nonbrewery assets, including real estate in Milwaukee, Wisconsin, as well as certain surplus bottles; (viii) the Olympia brewing facility at San Antonio, Texas; (ix) the Lone Star and Buckhorn (Texas) beer brands and related light products; (x) real estate in the State of Washington; (xi) net working capital aggregating at least $ 30,000,000; and (xii) any other assets listed in the Allocation Agreement entered into on February 10, 1983, between Heileman and Pabst (Allocation Agreement). In addition to its surrender of the Pabst shares acquired in the tender offer, Heileman assumed liability for certain industrial development revenue bonds (IDB's) as consideration for the distribution of the assets. The IDB's, with a total face amount of $ 3,480,000, represented financing for the Olympia brewing *265 facility at San Antonio, Texas, that was transferred to Heileman as part of the Transferred Assets. Pabst also paid Heileman $ 4,250,000 in cash in redemption of 400,005 Pabst shares acquired by Heileman prior to the tender offer, and Pabst added these shares to its treasury stock. These shares originally had been purchased by Heileman at a total cost of $ 7,607,325. The assets distributed to Heileman, together with the $ 4,250,000 in cash paid to Heileman, are subsequently referred to as the Transferred Assets. In addition, Pabst and Heileman entered into a 5-year manufacturing agreement whereby Pabst was required to purchase specified amounts of beer at a designated markup over actual cost, and Pabst agreed to lease from Heileman the Pabst office building and related parking areas in Milwaukee, Wisconsin. Petitioner and Heileman also entered into the Allocation Agreement whereby they agreed to the price to be allocated to each of the Transferred Assets. The Allocation Agreement stated that the aggregate value of the assets transferred to Heileman was $ 190,287,375. On February 26, 1983, petitioner and Olympia issued a prospectus and proxy statement (the Prospectus) to their *266 respective shareholders seeking approval of the transaction described above. The Prospectus stated that, contemporaneously with the merger of HBC and Olympia into Pabst, Heileman would acquire certain brewery and other assets of Pabst and Olympia "in exchange for" shares of Pabst held by HBC. In another reference, the Prospectus stated that the Pabst shares held by HBC were to be cancelled "In consideration for" the transfer of assets to Heileman. On March 18, 1983, at separate special meetings, the shareholders of Pabst and Olympia approved and adopted the Acquisition Agreement and the other relevant agreements. The Pabst shareholders of record at the time of the transaction (other than Heileman, HBC, Pabst, any of their subsidiaries, and any shareholders asserting their appraisal rights) had each of their Pabst shares converted into one 10-year, subordinated, sinking fund note of Pabst, having a $ 24 principal amount and bearing interest at a rate of 15 percent. As a result, the former Pabst shareholders retained no equity interest in Pabst following the completion of the transaction. In contrast, the Olympia shareholders at the time of the transaction had each of their Olympia *267 shares converted into the right to receive: (1) One share of Pabst stock, and (2) an amount in cash equal to the excess, if any, of $ 26 per share over the average market value of Pabst shares during a specified 11-day trading period. As a result, the former Olympia shareholders became the new shareholders of Pabst following the transaction. In order to discourage further hostile takeover attempts, tender offers, and proxy contests, Pabst's Certificate of Incorporation was amended. In addition, certain provisions of the Indenture pursuant to which the Pabst notes were issued limited the incurrence of indebtedness for the purpose of acquiring Pabst shares. On its tax returns, petitioner reported the distribution of the Transferred Assets as a sale under section 1001. Apparently based on the assumption that the value of the assets received in the purported sale equaled the value of the Transferred Assets, petitioner used the $ 190,287,375 aggregate valuation amount set forth in the Allocation Agreement as the amount realized from the purported sale. For the taxable period January 1 through March 18, 1983, petitioner reported a net gain of $ 40,362,574 from the transaction, and *268 for the taxable period March 19 through December 31, 1983, petitioner reported a net gain of $ 23,840,818 from the transaction. Respondent, in her notice of deficiency, determined that the value of the Transferred Assets exceeded the value reported by petitioner. In support of this position, respondent has submitted an appraisal report, dated July 26, 1982 (the Appraisal Report), prepared by Jackson-Cross Co. (Jackson-Cross), which was provided to respondent by petitioner's counsel on or about June 11, 1993, in response to an informal request for production of documents. The Appraisal Report, which was prepared on behalf of Pabst several months prior to the transaction at issue, contains valuation estimates for the three breweries included in the Transferred Assets, as well as for four other breweries owned by Pabst and Olympia. These estimates are higher than the values placed on the breweries by petitioner. Respondent also asserts that she has retained the services of Dr. Robert S. Weinberg as an expert witness, whose opinion is that the fair market value of the assets was greater than $ 190,287,375. As of the filing date of respondent's Notice of Objection to Petitioner's *269 Motion for Partial Summary Judgment, Dr. Weinberg had not yet submitted his report to respondent. Discussion
Before addressing the issues in this case, we set forth the familiar standards for granting a motion for summary judgment. Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials of phantom factual issues. O'Neal v. Commissioner, 102 T.C. 666, 674 (1994); Northern Ind. Pub. Serv. Co. & Subs. v. Commissioner, 101 T.C. 294, 295 (1993); Shiosaki v. Commissioner, 61 T.C. 861, 862 (1974). However, summary judgment is not a substitute for a trial, and disputes over factual issues are not to be resolved in such proceedings. Espinoza v. Commissioner, 78 T.C. 412, 416 (1982). Because the granting of summary judgment decides an issue against a party without a trial, it is granted sparingly, and only after carefully ascertaining that the moving party has met all the requirements for summary judgment. Associated Press v. United States, 326 U.S. 1, 6 (1945); O'Neal v. Commissioner, supra; *270 Espinoza v. Commissioner, supra.
A motion for summary judgment is granted "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b); O'Neal v. Commissioner, supra. The moving party bears the burden of establishing that this requirement is satisfied. Rule 121(b); O'Neal v. Commissioner, supra; Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994). In determining whether the moving party has established that no genuine issue as to any material fact exists, the opposing party is given the benefit of all reasonable doubt, and all inferences that may be drawn from the underlying facts contained in the record are viewed in a light most favorable to the opposing party. O'Neal v. Commissioner, supra; Sundstrand Corp. v. Commissioner, supra; *271 Espinoza v. Commissioner, supra.
1. Applicability of Section 311(d)(1)
In General
The first issue we consider is whether, for purposes of the Federal income tax, the transaction between petitioner and Heileman constituted a redemption of Pabst stock governed by section 311(d)(1), as respondent contends in her cross-motion for summary judgment, or a sale governed by section 1001, [3] as petitioner contends in its cross-motion. *272 The resolution of this issue will dictate the proper standard for measuring petitioner's gain in the transaction. If section 311(d) applies, the amount of gain is calculated based on the fair market value of the property distributed by petitioner to Heileman (i.e., the brewing facilities, brand names of beer, real property, and other Transferred Assets), see sec. 311(d)(1), while if section 1001 applies, the amount of gain is calculated based on the fair market value of the property received by petitioner from Heileman (i.e., the canceled Pabst shares and Heileman's assumption of the IDB liability); see sec. 1001(b). Respondent concedes that if the transaction is not a redemption under section 311(d)(1), then it constitutes a sale under section 1001. Accordingly, the parties' arguments and our analysis focus on the applicability of section 311(d)(1). Section 311(a), which sets forth the general rule of nonrecognition that applies to a corporation upon the distribution of its assets to shareholders, provides as follows: SEC. 311(a). General Rule. -- Except as provided in subsections (b), (c), and (d) of this section and section 453B, no gain or loss shall be recognized *273 to a corporation on the distribution, with respect to its stock, of -- (1) its stock (or rights to acquire its stock), or (2) property.
Section 311(d)(1), which contains an exception to this general rule of nonrecognition, provides as follows: SEC. 311(d). Appreciated Property Used to Redeem Stock. -- (1) In General. -- If -- (A) a corporation distributes property (other than an obligation of such corporation) to a shareholder in a redemption (to which subpart A applies) of part or all of his stock in such corporation, and (B) the fair market value of such property exceeds its adjusted basis (in the hands of the distributing corporation),
then a gain shall be recognized to the distributing corporation in an amount equal to such excess as if the property distributed had been sold at the time of the distribution. * * *
Section 311(d)(1)(A) does not itself define the term "redemption". Instead, that term is defined in section 317(b), which provides as follows: SEC. 317(b). Redemption of Stock. -- For purposes of this part, stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, *274 whether or not the stock so acquired is cancelled, retired, or held as treasury stock.
The term "property" is defined in relevant part as "money, securities, and any other property". Sec. 317(a). We agree with respondent that the transaction, as structured by petitioner, constitutes a redemption under the section 317(b) definition. Pursuant to the transaction, Pabst acquired and cancelled 5,600,000 shares of its stock that Heileman owned through HBC in exchange for the distribution of the Transferred Assets to Heileman. This structure falls squarely within the section 317(b) provision that a redemption occurs when a "corporation acquires its stock from a shareholder in exchange for property". The written documentation prepared by petitioner and the other parties to the transaction supports this conclusion. Following the successful completion of the Second HBC Offer, Pabst, Heileman, and the other parties entered into several agreements, including the Acquisition Agreement. Article IV of the Acquisition Agreement provided that, contemporaneously with the merger of Olympia and a wholly owned subsidiary of HBC into Pabst, Heileman was to receive the specified brewery and nonbrewery *275 assets of Pabst and Olympia "in exchange for" all HBC shares held by Heileman and the assumption of certain liabilities by Heileman, plus a specified amount of cash. Because HBC owned the 5,600,000 Pabst shares acquired in the successful Second HBC Offer, the surrender of all the HBC shares owned by Heileman in exchange for the assets constituted, in substance and effect, an exchange of the Pabst shares for the assets. See supra note 2. The Prospectus, dated February 26, 1983, which petitioner distributed to its stockholders in anticipation of the stockholders meeting at which the transaction at issue was formally approved, further establishes that the distribution of assets to Heileman was in exchange for the Pabst shares held by Heileman through HBC. The Prospectus specifically states that, contemporaneously with the above-mentioned mergers of Olympia and HBC's wholly owned subsidiary into Pabst, "Pabst and Olympia will in two or more steps transfer certain brewery and other assets to Heilemanin exchange for all Pabst Shares then held by HBC." (Emphasis added.) Furthermore, the Prospectus declares that the Pabst shares held by HBC will be cancelled "In consideration *276 for the transfer of assets to Heileman". (Emphasis added.) Status of Heileman as Vendee
Although the transaction was structured as a redemption within the meaning of sections 317(b) and 311(d)(1), petitioner contends that section 311(d)(1) is not applicable to the present case. According to petitioner, section 311(d)(1) is relevant only if the transaction first satisfies the threshold requirements of section 311(a). Petitioner argues that the general rule of section 311(a) is not satisfied because the distribution of assets to Heileman was not made by petitioner "with respect to its stock" as required by that statute. According to petitioner, the transaction was, in substance, a sale of the Transferred Assets between petitioner as vendor and Heileman as vendee, with the Pabst shares conveyed by Heileman serving as partial consideration for the sale. Because the transaction was not the result of an ordinary corporation/shareholder relationship, petitioner concludes, the transaction was not "with respect to" the Pabst stock owned by Heileman and is not governed by section 311(a). As support for its argument, petitioner cites the legislative history of section 311(a). *277 Section 311(a) was enacted in 1954 to codify the Supreme Court decision in General Utils. & Operating Co. v. Helvering, 296 U.S. 200 (1935), which held that a corporation did not recognize gain upon the distribution, with respect to its stock, of appreciated property. The committee report accompanying the legislation states that the committee did not intend: to alter existing law in the case of distribution of property, which has appreciated or depreciated in value, where such distributions are made to persons other than shareholders, or are made to shareholders in a capacity other than that of a shareholder. * * * [H. Rept. 1337, 83d Cong. 2d Sess. A90 (1954); emphasis added.] [4]
The "existing law" that section 311(a) left intact is reflected in former section 1.311-1(e), Income Tax Regs., [5] *279 which incorporated the critical language of its 1934 *278 predecessor, Regs. 77, art. 66 (1934) (the 1934 Regulation). [6] See Esmark, Inc. & Affiliated Cos. v. Commissioner, 90 T.C. 171, 184-185 (1988), affd. without published opinion 886 F.2d 1318 (7th Cir. 1989). The portion of former section 1.311-1(e), Income Tax Regs., upon which petitioner relies provided as follows: Section 311 is limited to distributions which are made by reason of the corporation-stockholder relationship. Section 311 does not apply to transactions between a corporation and a shareholder in his capacity as debtor, creditor, employee, or vendee, where the fact that such debtor, creditor, employee, or vendee is a shareholder is incidental to the transaction. Thus, if the corporation receives its own stock as consideration upon the sale of property by it, or in satisfaction of indebtedness to it, the gain or loss resulting is to be computed in the same manner as though the payment had been made in any other property. [Emphasis added.]
We agree with petitioner's contention that pre-1954 law, including the incorporation of that law in former section 1.311-1(e), Income Tax Regs., is relevant. See Esmark, Inc. & Affiliated Cos. v. Commissioner, supra at 184-185. However, as we noted in the Esmark case, reliance on pre-1954 law in this area is "largely unavailing", since it provides "practically no guidance" in determining whether section 311(a) applies to a given transaction. Id. at 185, 187. *280 We observed that, under pre-1954 case law and former section 1.311-1(e), Income Tax Regs., the determination of whether the recipient's status as a shareholder is "incidental" to the transaction, thereby taking the transaction outside of section 311(a), depends on a facts and circumstances analysis of each case. Id. at 185-187. We concluded that "Reduced to its essentials, the inquiry described in section 1.311-1(e), Income Tax Regs., is thus functionally equivalent to the other substance-over-form arguments advanced by respondent". [7]Id. at 187. For these same reasons, we believe that petitioner's argument that Heileman was acting as a vendee, rather than *281 a shareholder, within the meaning of the regulation, can be resolved only by reference to petitioner's more general substance-over-form argument discussed below. If, in substance, petitioner and Heileman were participants in a sale, the asset distribution by petitioner was not "with respect to its stock" within the meaning of section 311(a), and the issue of whether a redemption occurred under section 311(d)(1) is irrelevant. If, however, the substance of the transaction is consistent with its redemption form, the threshold requirement of section 311(a) is met, and section 311(d)(1) is controlling. Substance Over Form
Petitioner correctly asserts that, when the form of a transaction does not coincide with economic reality, the substance of the transaction rather than its form should determine the tax consequences. Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945); Glacier State Elec. Supply Co. v. Commissioner, 80 T.C. 1047, 1053 (1983). It is well settled that the Commissioner can invoke this substance-over-form argument to challenge the transactional form adopted by the taxpayer. Commissioner v. Court Holding Co., supra; *282 Higgins v. Smith, 308 U.S. 473, 477-478 (1940). In appropriate circumstances, a taxpayer may also argue that the substance of the transaction, rather than its form, should control the tax consequences of the transaction. Glacier State Elec. Supply Co. v. Commissioner, supra.This is particularly true when, as here, the taxpayer's tax reporting position shows an honest and consistent respect for the purported substance. Estate of Weinert v. Commissioner, 294 F.2d 750, 755 (5th Cir. 1961), revg. and remanding 31 T.C. 918 (1959). We find that the evidence presented by petitioner, even when viewed in the light most favorable to petitioner, fails to establish that the substance of the transaction differs from its form. We agree with respondent that the transaction was, in both form and substance, a redemption. Petitioner's substance-over-form argument focuses on the events leading up to the transaction. Under the circumstances, petitioner asserts, Heileman was not a "real" shareholder of petitioner, and, in substance, the distribution of the Transferred Assets *283 did not stem from a corporation/shareholder relationship between Heileman and petitioner. According to petitioner: Heileman was prohibited by law from becoming a real shareholder of Pabst. Accordingly, Pabst's redemption was, in effect, from the public shareholders who sold to Heileman as a temporary stakeholder. Pabst's disposition of assets was a sale to Heileman to raise cash to finance the redemption. The subject transaction was intended to be, and constituted in substance an asset sale. [Fn. refs. omitted.]
In support of its argument that Heileman was not a "real" shareholder, petitioner focuses on the voting restrictions placed on Heileman by the 1982 Consent Decree. The Justice Department required Heileman and petitioner to enter into the 1982 Consent Decree in order to ensure that Heileman would retain an interest only in those assets specified by the Agreement in Principle (i.e., the Transferred Assets), and that Heileman would not acquire control of the assets to be retained by the surviving Pabst entity. With respect to Heileman's ability to exercise its voting rights following the successful tender offer and prior to the contemplated asset distributions, *284 section IV of the 1982 Consent Decree provided that "Until the appointment of a trustee under this Final Judgment, Heileman shall be free to vote in any manner the stock of Pabst, subject to * * * [the Justice Department's] prior approval." [8] Contrary to petitioner's assertion, this limitation on Heileman's voting rights does not preclude Heileman from being a "real" shareholder of Pabst. The Justice Department's right of approval was intended to limit Heileman's ability to control the assets that were not being distributed to Heileman. Because Heileman had no intention of exercising control over those assets, the Justice Department's right of approval did not constitute a substantial encumbrance on Heileman's rights (through HBC) as a shareholder. More importantly, the Justice Department's rights did not interfere with Heileman's ability to vote its Pabst shares in favor of the transaction at issue. Indeed, access to this voting power was the prize sought by Heileman in its successful tender offer to the public shareholders of Pabst. By acquiring and exercising this voting power, Heileman was able to assure that it would prevail over the Jacobs Group and Kalmanovitz in the *285 bidding for control of Pabst. For similar reasons, we disagree with petitioner's contention that the redemption, in substance, was between Pabst and the tendering shareholders, with Heileman acting as a mere "temporary stakeholder". We rejected a similar argument in Esmark, Inc. & Affiliated Cos. v. Commissioner, 90 T.C. 171 (1988). In that case, Mobil Oil Corp. (Mobil), as part of a prearranged agreement with Esmark, Inc. (Esmark), acquired a majority of Esmark's outstanding shares in a public tender offer. Esmark then distributed shares of Vickers, a wholly owned subsidiary, to Mobil in redemption of the Esmark shares acquired by Mobil in the tender offer. The Commissioner *286 argued that the redemption was, in substance, a sale of Vickers to Mobil, followed by a redemption of the Esmark stock for cash. [9] We rejected the Commissioner's argument that the public shareholders who tendered their Esmark shares to Mobil were the "true" owners of the stock when it was subsequently redeemed. We observed: [Esmark's] tendering public shareholders surrendered all incidents of ownership upon the closing of the tender offer. They sold out. * * * [Esmark's] former shareholders could no longer vote their shares, receive dividends, or sell to anyone else. Most importantly, they could no longer resist * * * [Esmark's] disposal of its energy segment or its redemption of more than 50 percent of its outstanding stock. * * * Mobil, not * * * [Esmark's] former shareholders, thus enjoyed one of the most important attributes of ownership, to wit, the right to receive distributions of corporate assets. Mobil, not * * * [Esmark's] former shareholders, was the beneficial as well as the legal owner of * * * [Esmark's] stock. Id. at 193-194.]
*287 Similarly, the tendering shareholders in the present case surrendered their rights to vote for or against the distribution of the Transferred Assets, as well as their rights to receive distributions of the corporate assets. These important rights were acquired by and belonged to Heileman, and were fundamental to the consummation of the transaction. Petitioner also cites Idol v. Commissioner, 38 T.C. 444 (1962), affd. 319 F.2d 647 (8th Cir. 1963), in support of its substance-over-form argument. In that case, a third party was interested in acquiring certain assets of a corporation of which the taxpayer (Idol) was the sole shareholder. Idol structured the transaction in a way that he hoped would allow him to withdraw cash from his corporation as capital gain rather than a dividend. Idol sold a portion of his stock to the purchaser and, on the same day, caused the corporation to distribute the desired assets to the purchaser in exchange for the purchaser's recently acquired shares. We held that, in substance, the transaction was a sale by the corporation of a portion of its assets to the purchaser, followed by a dividend *288 distribution of the sales proceeds to Idol. The facts of the present case are materially different from those in Idol. The transaction in Idol resulted in no significant change in stock ownership of the corporation. Idol was the sole shareholder of the corporation before the transaction, and he remained so after the transaction. We recognized the importance of this factor in Idol, stating: Not only is it plain from the evidence before us that * * * [the purchaser] had no interest in acquiring any of * * * [the corporation's] stock, but there is no indication here that Idol had any real desire to dispose of any part of his 42 shares of the corporation's stock. The only reason the transactions were cast in the form of a sale of stock followed by a redemption was the possibility of obtaining favorable tax treatment. [Id. at 460.]
In contrast, the present transaction effected a significant shift in the stock ownership of petitioner. The transaction was the culmination of Pabst's attempts to provide its shareholders with a means of realizing the underlying asset value of their investment in Pabst. The 5,600,000 shares surrendered *289 by the public shareholders pursuant to the tender offer constituted more than two-thirds of the then-outstanding shares of Pabst. Moreover, the remaining shares held by the public shareholders of Pabst were converted into Pabst notes pursuant to the merger, and the former public shareholders of Olympia became the new equity owners of Pabst. As a result, the present transaction had real and substantive effects on petitioner's ownership structure, with the former public shareholders of Pabst retaining no further equity interest in the surviving Pabst entity. The present case also differs significantly from Idol with respect to the corporate purposes served by the redemption of the newly acquired stock. In Idol, we observed: Not only does the evidence before us fail to disclose that * * * [the taxpayer] really wished to dispose of any of his 42 * * * shares or that * * * [the purchaser] desired to acquire them, but it also fails to indicate that * * * [the corporation] had any reason or purpose to reacquire part of its outstanding shares. Petitioners have not established that * * * [the corporation] had a real intention to reduce its capital or to redeem any part of its *290 outstanding stock. [Idol v. Commissioner, supra at 460.]
In contrast, the transaction at issue resulted in a substantial restructuring of petitioner's business operations. Petitioner transferred two of its four brewing facilities to Heileman. Petitioner also divested itself of several beer brands and significant operational assets. Moreover, the structure of the transaction allowed petitioner to accomplish the important corporate purpose of fending off an undesired takeover of the company by Kalmanovitz and the Jacobs Group. Petitioner also cites two of respondent's published revenue rulings, Rev. Rul. 80-221, 1980-2 C.B. 107, and Rev. Rul. 83-38, 1983-1 C.B. 76, contending that positions adopted by respondent in those rulings are contrary to respondent's arguments in the present case. We disagree with petitioner's reliance on those rulings. As an initial matter, we reiterate our longstanding view that revenue rulings are not binding precedent on this Court. [10]Intel Corp. & Consol. Subs. v. Commissioner, 100 T.C. 616, 621 (1993); *291 Stark v. Commissioner, 86 T.C. 243, 250-251 (1986). This principle is particularly applicable with respect to petitioner's citation of Rev. Rul. 83-38, supra. In that ruling, which involved facts substantially identical to those presented in Esmark, Inc. & Affiliated Cos. v. Commissioner, 90 T.C. 171 (1988), respondent held that the form of a tender offer/redemption transaction should be ignored, and that the transaction should be treated in substance as a sale of assets by the distributing corporation to the purchaser of the tendered stock. Although petitioner correctly observes that respondent's holding in that ruling supports petitioner's position in the present case, petitioner fails to acknowledge that, in Esmark, Inc. & Affiliated Cos. v. Commissioner, supra, we rejected the position adopted by respondent in Rev. Rul. 83-38, supra. Accordingly, petitioner's reliance on that revenue ruling is misplaced. *292 We also disagree with petitioner's reliance on Rev. Rul. 80-221, supra. The corporate taxpayer in that ruling owned a piece of vacant land that another corporation wanted to purchase. In an attempt to prevent the transaction from being taxed as a sale, the distributing corporation created a new class of "preferred stock" and sold the sole share of that stock to the purchasing corporation for an amount equal to the fair market value of the vacant land. The purchasing corporation later exercised its rights as the holder of the preferred stock to receive a distribution of the vacant land, as well as cash representing an accrued dividend, in redemption of its stock. The ruling concluded that the form of the transaction should be ignored, and that the transaction should be treated as a sale of the land taxable under section 1001. The relevant facts in Rev. Rul. 80-221, supra, are significantly different from those in the present case. For example, the transaction in the ruling did not cause a permanent change in the stock ownership of the distributing corporation. The parties created a special *293 form of preferred stock solely for the transaction, and that class of stock had no ongoing relevance after the transaction was completed. In contrast, the present transaction resulted in a real and substantial transfer of petitioner's equity ownership from the pre-tender offer public shareholders to Heileman, and then to the former shareholders of Olympia. As we discussed above in our analysis of Idol v. Commissioner, 38 T.C. 444 (1962), this difference is an important factor in determining that the form of a redemption should be respected. Because of this important distinction between the facts of Rev. Rul. 80-221, supra, and the present case, petitioner's reliance on that ruling is misplaced, and we need not further evaluate the merits of the ruling. For the foregoing reasons, we conclude that the substance of the transaction coincides with its form. After Heileman acquired the stock of Pabst in a tender offer, Pabst distributed the Transferred Assets to Heileman in redemption of Heileman's Pabst stock. Pabst made the distribution "with respect to its stock", within the meaning of section 311(a), *294 and the distribution constituted a redemption governed by section 311(d). Having concluded that the substance of the transaction accords with its form, we must address one other argument raised by petitioner that relates to this issue. Petitioner contends that the parties would have preferred to structure the transaction as a straightforward sale of the Transferred Assets to Heileman, but were prevented from doing so by business exigencies. Petitioner notes that the form of the transaction was dictated by the competing efforts of the Jacobs Group and Kalmanovitz to obtain control of Pabst. According to petitioner, the Jacobs Group had the potential power to block any direct sale of assets to Heileman, and the tender offer structure was necessary in order to avoid interference by the Jacobs Group. Even if we assume that petitioner's contention is true, we do not find it relevant. The fact that the parties might have preferred to structure the transaction in a different way does not change the substance of what actually occurred. The structure of nearly every business transaction is dictated, at least in part, by business exigencies. Because the transaction was, in substance, *295 a distribution of assets to Heileman in redemption of its Pabst shares, the transaction must be treated as such for Federal income tax purposes. As the Supreme Court observed in Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974): While a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not. "To make the taxability of the transaction depend upon the determination whether there existed an alternative form which the statute did not tax would create burden and uncertainty." [Citations omitted.]
See also Glacier State Elec. Supply Co. v. Commissioner, 80 T.C. at 1058. 2. Fair Market Value of Transferred Assets The second issue we address concerns the fair market value of the Transferred Assets. Because the transaction constitutes a redemption governed by section 311(d)(1), the gain recognized by petitioner equals the excess of (i) the fair market value of the Transferred *296 Assets, determined as if the Transferred Assets had been sold at the time of the distribution, over (ii) the adjusted basis of the Transferred Assets in the hands of petitioner. Sec. 311(d)(1); see also Pope & Talbot, Inc. & Subsidiaries v. Commissioner, 104 T.C.   (1995). In its Motion for Partial Summary Judgment, petitioner contends that the transfer of assets from Pabst to Heileman was at arm's length, and that the price agreed to by the parties to the transaction conclusively establishes the fair market value of the Transferred Assets. As noted above, a motion for summary judgment is granted only if "the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b); O'Neal v. Commissioner, 102 T.C. at 674. For the reasons set forth below, we find that a genuine issue of material fact exists as to the fair market value of the Transferred Assets, and we do not believe it is appropriate to resolve this issue as a matter of law. Accordingly, *297 it will be necessary for the parties to agree upon the fair market value of the assets or submit that question of fact to the Court for resolution. Admissibility of Jackson-Cross Appraisal Report
Before detailing the reasons for our denial of petitioner's Motion for Partial Summary Judgment as to the fair market value of the Transferred Assets, we address an objection made by petitioner concerning the admissibility of the Appraisal Report prepared by Jackson-Cross. This report, which was prepared on behalf of Pabst several months prior to the transaction at issue, contains valuation estimates for the three breweries included in the Transferred Assets, as well as for four other breweries owned by Pabst and Olympia. These estimates are higher than the values placed on the three transferred breweries by petitioner. Petitioner sets forth a litany of arguments for not admitting the Appraisal Report into evidence. For the following reasons, we disagree with each of them. First, petitioner contends that the Appraisal Report is inadmissible because it was not contained or referenced in the joint stipulation of facts filed by the parties. Petitioner cites no authority in support *298 of this contention, and we find it to be without merit. The parties' stipulation of facts explicitly states that "The parties reserve their right to introduce other and further evidence not inconsistent with the facts herein stipulated." Because the stipulation of facts contains no stipulation as to the fair market value of the brewery facilities analyzed in the Appraisal Report, we do not believe that the Appraisal Report is inconsistent with the facts stipulated by the parties. Petitioner further contends that respondent's submission of the Appraisal Report does not comply with Rule 121 of this Court's Rules of Practice and Procedure, which governs motions for summary judgment. Rule 121 provides that the party opposing a motion for summary judgment shall file a written response, with or without supporting affidavits, and that we may render a decision if the "pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b). The Rule also requires: Supporting and opposing affidavits *299 shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or filed therewith. * * * When a motion for summary judgment is made and supported as provided in this Rule, an adverse party may not rest upon the mere allegations or denials of such party's pleadings, but such party's response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, then a decision, if appropriate, may be entered against such party. [Rule 121(d).]
Although petitioner does not specify which provision of Rule 121 is violated, its argument apparently focuses on the lack of an affidavit from a person competent to testify as to the Appraisal Report. Petitioner's argument, however, ignores Rule 121(e), which provides in relevant part as follows: If it appears from the affidavits of a party opposing the motion that such party's only legally *300 available method of contravening the facts set forth in the supporting affidavits of the moving party is through cross-examination of such affiants or the testimony of third parties from whom affidavits cannot be secured, then such a showing may be deemed sufficient to establish that the facts set forth in such supporting affidavits are genuinely disputed.
In his affidavit, respondent's attorney states that no representative of Jackson-Cross would discuss the Appraisal Report with him without the permission of Pabst unless a subpoena were served on Jackson-Cross compelling someone from the company to testify. As a result, respondent could not obtain an affidavit from Jackson-Cross authenticating the report at this time. For this reason, Rule 121(e) applies, and the admission of the Appraisal Report does not violate Rule 121. Petitioner also contends that the Appraisal Report violates numerous provisions of the Federal Rules of Evidence, [11] including rules 602, 603, 701, 702, 801, 802, and 901. These rules relate to the testimony of witnesses, expert testimony, and hearsay. Petitioner's laundry list of objections is without merit. We believe that each of petitioner's protestations *301 can be remedied at trial by admitting the report through the testimony of an appropriate employee of Jackson-Cross. Fed. R. Evid. 901(a). As noted above, the affidavit of respondent's attorney states that an employee of Jackson-Cross will testify as to the Appraisal Report if compelled to do so by subpoena. Petitioner next argues that the Appraisal Report is not relevant, citing rules 401 and 402 of the Federal Rules of Evidence. We disagree. The report concerns the fair market value of certain assets that were transferred to Heileman by petitioner, which is one of the issues before the Court. *302 Accordingly, the Appraisal Report is relevant. Cf. In re MDL-731-Tax Refund Litigation, 989 F.2d 1290, 1298 (2d Cir. 1993) (appraisal evidence is relevant to the determination of whether negotiations were truly arm's length). Petitioner also contends that the report is not relevant because of "the existence of the actual arms-length price paid by Heileman in the March 1983 asset sale approximately eight months after the date of the appraisal". We disagree with this statement for several reasons. As discussed above, the transaction was not, in either form or substance, an asset sale, but was instead a distribution of assets to Heileman in redemption of its Pabst stock. Moreover, the parties have not stipulated that the valuations placed on the assets by Pabst and Heileman were arm's-length prices. Indeed, that is one of the issues before the Court. Petitioner next asserts that the Appraisal Report cannot create a genuine issue of material fact because it is inadmissible as evidence and therefore does not constitute specific facts, citing Propstra v. United States, 680 F.2d 1248, 1251 (9th Cir. 1982). This argument *303 appears to be circular in the context of petitioner's objection to the admissibility of the Appraisal Report, as the argument presupposes that the report is inadmissible. Because we hold that the report is admissible as evidence, it can create a genuine issue of material fact. In contrast, summary judgment was granted to the taxpayer in Propstra v. United States, supra at 1251, because the Government failed to tender any evidence regarding the fair market value of the property in question. Petitioner also contends that the Appraisal Report cannot create a genuine issue of material fact because section 311(d) does not grant respondent the right to construct a sale price for purposes of computing petitioner's tax obligations. In support of this allegation, petitioner cites section 4216(b)(1). That section, which is a part of the manufacturers excise tax of chapter 32, Internal Revenue Code of 1986, permits respondent to construct a sale price for purposes of computing a taxpayer's excise tax obligation only under certain specified circumstances. See Storm Plastics, Inc. v. United States, 770 F.2d 148, 152 (10th Cir. 1985). *304 Section 4216(b)(1) is inapposite to the present case. That section is a part of a detailed framework for calculating the excise tax on specified manufactured articles. As such, it is inappropriate to take the provision out of context and use it to determine the Federal income tax consequences of a corporate distribution. Furthermore, we disagree with petitioner's apparent contention that the specific reference to the construction of a sale price in section 4216(b)(1) precludes either respondent or this Court from calculating the fair market value of assets in the absence of an explicit Code authorization to "construct" a sale price. The requirement that gain under section 311(d)(1) be calculated based on the fair market value of the Transferred Assets necessarily implies that respondent and this Court may review the price reported by petitioner to ensure that it represents the actual fair market value. To hold otherwise would undermine the integrity of the statute. See Nestle Holdings, Inc. v. Commissioner, 94 T.C. 803, 815 (1990). As its final argument concerning the admissibility of the Appraisal Report, petitioner claims that, even if the *305 report is admissible, it contains on its face certain facts and assumptions that make it inappropriate for consideration. For example, petitioner maintains that the report was prepared under extraordinary time pressure and that Jackson-Cross did not utilize the appropriate valuation methods. While there may or may not be merit in these claims, we do not believe that they should be considered in the present summary judgment proceeding. The potential deficiencies in the Appraisal Report calculations relate to the weight to be given the evidence, not its admissibility, and will be given due consideration at trial. Existence of a Genuine Issue of Material Fact
Having concluded that the Appraisal Report is admissible, we now discuss our reasons for denying petitioner's motion for partial summary judgment regarding the fair market value of the Transferred Assets. Petitioner's primary contention is that the arm's-length character of the transaction obviates the need for a trial to determine the fair market value of the Transferred Assets. According to petitioner, the fair market value of Transferred Assets equals the $ 190,287,375 amount specified in the Allocation Agreement. [12] *306 Because petitioner is the moving party on this issue, it bears the burden of establishing that "there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law" with respect to this issue. Rule 121(b); O'Neal v Commissioner,102 T.C. at 674. *307 Petitioner's first argument is that both the language and purpose of section 311(d) permit respondent to challenge the taxpayer's valuation only when the distribution does not have the indicia of an arm's-length sale and no fair market value has been determined. In support of this contention, petitioner cites the section 311(d) requirement that the distributing corporation recognize gain "as if the property distributed had been sold at the time of the distribution". (Emphasis added.) In order to give the terms" distributed" and "sold" independent meanings, petitioner contends, the hypothetical valuation referred to in section 311(d) is unnecessary when the distributed property was in fact sold in an arm's-length transaction. We disagree with petitioner's reasoning. Petitioner's argument is premised on the assumption that the transaction at issue was, in fact, an arm's-length sale of the Transferred Assets at their fair market value. The problem with petitioner's position is that we cannot conclude as a matter of law that this premise is true. The determination of the fair market value of property is a question of pure fact, requiring the trier of fact to weigh all relevant *308 evidence of value and to draw appropriate inferences. Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). In order to determine the fair market value of the Transferred Assets we must ascertain "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; United States v. Cartwright, 411 U.S. 546, 551 (1973); Meredith Corp. & Subs. v. Commissioner, 102 T.C. 406, 424 (1994). This standard requires us to analyze the property from the perspective of a hypothetical buyer and a hypothetical seller, not the actual parties to the transaction. Estate of Bright v. United States, 658 F.2d 999, 1005 (5th Cir. 1981). Only by analyzing all of the relevant evidence, including the Appraisal Report, and drawing appropriate inferences, can we *309 determine whether the price attributed to the Transferred Assets by petitioner satisfies this standard. Although the record contains evidence that the transaction was the result of arm's-length negotiations, that is not a sufficient reason to conclude, as a matter of law, that petitioner's valuation of the Transferred Assets is correct. In re MDL-731-Tax Refund Litigation, 989 F.2d at 1298. As the Court of Appeals for the Second Circuit observed in In re MDL-731-Tax Refund Litigation, supra at 1298: The pertinent valuation should, like any question of fact, be determined on all available evidence, including evidence of the nature of the negotiations and expert appraisal evidence. Both kinds of evidence are relevant to the disputed valuation, and each reflects upon the reliability of the other. Appraisal evidence is thus relevant to whether the negotiations were truly arm's-length. If, after viewing all the evidence, including appraisal evidence, the trier determines that the negotiations were truly arm's-length and informed, it should accept the results of those negotiations as reflecting an accurate valuation. If it determines that *310 the negotiations were not arm's- length and informed, then it may look to the appraisal evidence as evidence of value.
See also Community Bank v. Commissioner, 79 T.C. 789, 793 (1982), affd. 819 F.2d 940 (9th Cir. 1987) (in denying a summary judgment motion, the Court concluded "that genuine issues of material fact remain in that the fair market value of the properties in question must be determined for Federal tax purposes and that a decision cannot be rendered as a matter of law"). We also note another deficiency in petitioner's argument. Whereas the instant case centers on the value of the Transferred Assets that were distributed to Heileman in the redemption, the evidence of arm's-length negotiations to which petitioner so strenuously points (e.g., the competing tender offers of the Jacobs Group and Kalmanovitz) relates to the valuation of petitioner's common stock. The various competing offers were not direct bids on the Transferred Assets, but were, instead, offers to buy varying amounts of Pabst stock at various prices. Moreover, the competing bids were all-or-nothing offers for control of Pabst. For example, *311 the Jacobs Group agreed to settle and take part in Heileman's successful tender offer only after Jacobs concluded that Heileman's offer would prevail and that he might be shut out of that offer's proration pool. These factors further convince us that, although a trier of fact could conclude that the value of the Transferred Assets is sufficiently related to the value of the tendered common stock to justify a reliance on the price paid for the stock, this conclusion is not required as a matter of law. Petitioner also contends that the transaction is governed by the "presumed-equivalence-in-value" rule of United States v. Davis, 370 U.S. 65, 71-74 (1962). As a result, petitioner argues, the value of the Transferred Assets must be determined by reference to the value of the Pabst stock surrendered and the IDB liability assumed by Heileman, because the latter assets are more easily valued. We disagree. In Davis, a husband transferred stock to his ex-wife pursuant to a property settlement agreement in exchange for her relinquishment of her marital rights. Because of the inherent difficulty of valuing the relinquishment of the ex-wife's marital rights, *312 the Supreme Court assumed that the transaction was at arm's length and used the value of the surrendered stock to determine the amount realized by the husband for purposes of calculating his gain. We do not believe that the presumed-equivalence-in-value rule requires us to value the Transferred Assets solely by reference to the Pabst shares surrendered by Heileman and the IDB liability assumed by Heileman. Unlike the taxpayer in Davis, who introduced no evidence to challenge the arm's-length nature of the transaction or to otherwise aid in directly valuing the asset in question, respondent in the present case has offered the Appraisal Report and intends to introduce the expert testimony of Dr. Weinberg. Because this evidence raises a genuine issue of material fact as to the arm's-length nature of the transaction and the fair market value of the Transferred Assets, we cannot avoid a valuation of the Transferred Assets simply because the stock surrendered by Heileman and the liabilities assumed by Heileman might be easier to value. See also Mitchell v. Commissioner, 590 F.2d 312, 314 (9th Cir. 1974) (Davis method of valuation used "only *313 as a last resort"). As further support for the applicability of the presumed-equivalence-in-value argument, petitioner cites Bar L Ranch, Inc. v. Phinney, 426 F.2d 995, 1001 (5th Cir. 1970). In particular, petitioner quotes the court's observation that the presumed-equivalence-in-value rule has been applied in "'cases involving valuation of property for which there is little or no market'", and "In such circumstances use of the Davis presumed-equivalence-in-value rule may even be preferable to expert appraisals of the value of the property received." Id. at 1001 (quoting Seas Shipping Co. v. Commissioner, 371 F.2d 528, 529 (2d Cir. 1967), affg. a Memorandum Opinion of this Court. Petitioner's reliance on Bar L Ranch, Inc. v. Phinney, supra, is misplaced. That case involved the fair market value of a note and accounts received by the taxpayer. In valuing these assets, the District Court refused to consider the fair market value of real property that had been exchanged for the note and the accounts. The Court of Appeals for the Fifth Circuit, citing *314 United States v. Davis, supra, concluded that the fair market value of the exchanged real property was a relevant factor to be considered in valuing the note and accounts, and remanded the case to the District Court for further valuation proceedings. Accordingly, the case merely stands for the proposition that the value of property exchanged for the property in question can be one relevant factor in determining the value of the property in question. [13] It does not support petitioner's argument that the value of the easier-to-value property conclusively determines the value of the other property. Indeed, the Court of Appeals explicitly rejected the use of the presumed-equivalence-in-value rule in this manner, noting that it would "be inappropriate to give the presumed-equivalence-in-value rule the full presumptive effect given in Davis et al." Bar L Ranch, Inc. v. Phinney, supra at 1001; cf. Philadelphia Park Amusement Co. v. United States, 130 Ct. Cl. 166, 126 F. Supp. 184 (1954) (absent a factual inquiry into whether a transaction was arms length, for purposes *315 of determining the cost basis of property received in a taxable exchange the fair market value of the property received does not necessarily equal the fair market value of the property surrendered); FX Sys. Corp. v. Commissioner, 79 T.C. 957, 962-964 (1982) (for purposes of determining a corporation's cost basis in property received in exchange for its stock, the fair market value of the corporation's distributed stock does not necessarily equal the fair market value of the property received).
Petitioner also argues that practical considerations support its position. According to petitioner, the denial of its motion will subject the parties and the Court to a *316 lengthy and costly valuation proceeding. Petitioner also notes that, as a result of a trial, the Court might conclude that the fair market value of the Transferred Assets is less than the value reported by petitioner. We sympathize with petitioner's concern over the time and cost of a valuation proceeding, as we have previously noted that the record contains some evidence of an arm's-length transaction. However, we do not think that this is a sufficient reason for us to abdicate our responsibility as the trier of fact in appropriate cases. As we observed in Nestle Holdings, Inc. v. Commissioner, 94 T.C. at 815: As must be true of any market-based economy, the concept of fair market value has always been part of the warp and woof of our income, estate, and gift tax laws, and concomitantly the necessity of determining the fair market values of numerous assets for equally numerous purposes has always been a vital and unavoidable function of the tax administrative and judicial process. * * *
We have considered petitioner's other arguments and find them to be unpersuasive. In summary, we conclude that a genuine issue of material fact remains *317 with respect to the fair market value of the Transferred Assets, and that the value of those assets cannot be decided as a matter of law. Having resolved the legal issues presented by the parties' motions, we are left with a pure factual issue -- the value of the Transferred Assets. As this Court observed in Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 451 (1980), this type of "issue is more properly suited for the give and take of the settlement process than adjudication." An agreement between the parties has the benefit of: saving the expenditure of time, effort, and money by the parties and the Court -- a process not likely to produce a better result. Indeed, each of the parties should keep in mind that, in the final analysis, the Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road compromise which we suspect each of the parties expects the Court to reach. * * * [Id. at 452.]
Of course, we do *318 not intend to avoid our responsibilities and, if the parties so insist, we will value any or all of the Transferred Assets. However, given the importance of efficiently administering our duties, we strongly encourage the litigants to do all within their power to resolve this valuation issue themselves. For the foregoing reasons, we will (i) grant respondent's motion for partial summary judgment with respect to the applicability of section 311(d)(1), (ii) overrule petitioner's objection concerning the admissibility of the Appraisal Report, and (iii) deny petitioner's motion for partial summary judgment with respect to the treatment of the transaction as a sale under section 1001 and with respect to the fair market value of the Transferred Assets. An appropriate order will be issued.
Footnotes
1. The determinations for the taxable years ended Mar. 18, 1983, and Mar.19, 1983, are in the alternative. The parties agree that petitioner had two taxable periods during the 1983 calendar year, the first one ending in mid- March and the second one ending Dec. 31. Petitioner filed its return using Mar. 18, 1983, as the ending date of the mid-March taxable period. Respondent determined that the proper ending date was Mar. 19, 1983, but asserted the deficiency for the Mar. 18, 1983, period in the alternative. The notice of deficiency asserts that identical adjustments apply regardless of whether Mar. 18 or Mar. 19 is the proper ending date. Because the issue is not before the Court at this time, we need not decide which ending date is correct.↩
1. Sec. 311↩ was substantially amended by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2272, sec. 631(c). These amendments, however, do not apply to the tax years at issue.
2. Because HBC was a wholly owned subsidiary of Heileman, whose sole function was to facilitate the tender offer, for convenience we sometimes refer to Heileman's surrender of its HBC stock as a surrender by Heileman of the 5,600,000 shares of Pabst stock held by HBC. The parties themselves sometimes refer to the surrender of these Pabst shares as coming directly from Heileman, and this simplification does not affect our holdings.↩
3. The relevant part of sec. 1001 provides as follows: SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS. (a) Computation of Gain or Loss. -- The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain * * * (b) Amount Realized. -- The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * * * * * (c) Recognition of Gain or Loss. -- Except as otherwise provided in this subtitle, the entire amount of the gain or loss, determined under this section, on the sale or exchange of property shall be recognized.↩
4. The Senate Finance Committee report contains substantially identical language. S. Rept. 1622, 83d Cong. 2d Sess. 247 (1954).↩
5. Former sec. 1.311-1, Income Tax Regs., was redesignated as relating to prior law and was removed from the Code of Federal Regulations system pursuant to T.D. 8474, 1993-1 C.B. 242. See also Notice 92-12, 1992-1 C.B. 500↩, 504.
6. The relevant part of the 1934 regulation, Regs. 77, art. 66 (1934), provided: if the corporation receives its own stock as consideration upon the sale of property by it, * * * the gain or loss resulting is to be computed in the same manner as though the payment had been made in any other property. * * *
This language appears verbatim in former sec. 1.311-1(e), Income Tax Regs. See also Esmark, Inc. & Affiliated Cos. v. Commissioner, 90 T.C. 171, 185 (1988), affd. without published opinion 886 F.2d 1318↩ (7th Cir. 1989).
7. In Esmark Inc. & Affiliated Cos. v. Commissioner, supra at 171, the Commissioner, rather than the taxpayer, argued that former sec. 1.311-1(e), Income Tax Regs., and pre-1954 law took the transaction outside of the scope of sec. 311(a). See infra↩ note 10.
8. In order to enforce the terms of the 1982 Consent Decree, the Justice Department retained the right to petition the District Court for the appointment of a trustee in the event the contemplated mergers and asset distributions were not consummated by Feb. 15, 1983. No trustee was ever appointed under this provision.↩
9. in Esmark permitted the transaction to escape taxation by reason of former sec. 311(d)(2)(B). That section, which was one of the last vestiges of the doctrine of General Utils. & Operating Co. v. Helvering,296 U.S. 200 (1935), permitted a parent corporation to redeem its own shares with the appreciated stock of a subsidiary without recognizing gain on the distributed subsidiary stock. See Esmark, Inc. & Affiliated Cos. v. Commissioner, supra↩ at 183-184. Accordingly, the Commissioner argued that the transaction was not, in substance, a redemption.
10. We also note that It has long been the position of this Court that our responsibility is to apply the law to the facts of the case before us and determine the tax liability of the parties before us; how the Commissioner may have treated other taxpayers has generally been considered irrelevant in making that determination. * * * [Davis v. Commissioner, 65 T.C. 1014, 1022 (1976); citations omitted.]
Although we make an exception to this rule under certain circumstances, such as alleged constitutional violations, see Nationalist Movement v. Commissioner, 102 T.C. 558, 594-595, (1994), affd. 37 F.3d 216 (5th Cir. 1994); Penn-Field Indus. Inc. v. Commissioner, 74 T.C. 720, 722↩ (1980), petitioner has made no such allegations.
11. This Court applies the rules of evidence applicable in trials without jury in the U.S. District Court for the District of Columbia. Sec. 7453; Rule 143(a). These include the Federal Rules of Evidence. Conti v. Commissioner, 99 T.C. 370, 373 (1992), affd. 39 F.3d 658 (6th Cir. 1994); Snyder v. Commissioner, 93 T.C. 529, 531↩ (1989).
12. It appears that this total is derived from the sum of (i) the price paid by Heileman for the 5.6 million tendered shares that were redeemed in the transaction ($ 179,200,000), (ii) the price paid by Heileman for the 400,005 Pabst shares that Heileman owned prior to the tender offer, which were also redeemed in the transaction ($ 7,607,325), and (iii) the $ 3,480,000 of industrial revenue bonds that were assumed by Heileman pursuant to the transaction. The record does not explain the $ 50 discrepancy between the sum of these three amounts ($ 190,287,325) and the figure contained in the Allocation Agreement ($ 190,287,375). We find the discrepancy insignificant for purposes of deciding the motion before us.↩
13. This proposition is not in doubt in the present case, as respondent has not challenged the relevance of the value of the stock surrendered by Heileman to the valuation of the Transferred Assets. Respondent merely argues that the value of the stock does not, as a matter of law, determine the value of the Transferred Assets.↩