**STORM PLASTICS, INC.,**
**Plaintiff-Appellant,**

v.

**The UNITED STATES of America,**
**Defendant-Appellee.**

No. 83–1661.

United States Court of Appeals,
Tenth Circuit.

Aug. 20, 1985.

R. Gordon Appleman (William R. Laney, Laney, Dougherty, Hessin & Beavers, Oklahoma City, Okl., with him on briefs), Kelly, Appleman, Hart & Hallman, Fort Worth, Texas, for plaintiff-appellant.

Murray S. Horwitz, Dept. of Justice, Washington, D.C. (Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup and Richard W. Perkins, Dept. of Justice, Washington, D.C., and William S. Price, U.S. Atty., Oklahoma City, Okl., with him on brief), for defendant-appellee.

Before BARRETT, BREITENSTEIN and TIMBERS,* Circuit Judges.

BARRETT, Circuit Judge.

Storm Plastics, Inc. (taxpayer), instituted this action seeking refund of manufacturers excise taxes. The government counterclaimed for additional taxes, interest, and penalties. After trial to the court, taxpayer's refund claim was dismissed. On the government's counterclaim, the court adjudged taxpayer to be indebted to the United States in the amount of $106,033.37. Taxpayer appeals from this latter award.

Prior to trial, the parties entered into extensive stipulations. Except where indicated, those stipulations constitute the facts as related hereafter. Storm Manufacturing Company (Storm) began as a partnership in 1964. The partners were Gary and William Storm. Their business was the manufacture and distribution of artificial fishing lures. In 1967, Gary and William incorporated Storm under the same name. After Richard Storm joined Storm in 1968, the three brothers and their mother, Imogene, decided to separate the manufacturing function from the distribution function. To this end, taxpayer was created in 1968 to function as the manufacturing entity; Storm, on the other hand, was henceforth to function solely as the wholesale distributor.

During the tax years at issue in this appeal, the ownership of taxpayer and Storm, by percentages, was as follows:

| STOCKHOLDER | TAXPAYER | STORM |
|---|---|---|
| Imogene | —0— | 13.336 |
| Gary | 26.66 | 28.888 |
| William | 26.66 | 28.888 |
| Richard | 26.66 | 28.888 |
| White[1] | 10.01 | —0— |
| Keim | 10.01 | —0— |

During this same period, the various members of the Storm family occupied key positions in both taxpayer and Storm.[2]

In 1970, the Storms formed AquaSport, Inc., to distribute novelty fishing lures. Imogene, Gary, William, and Richard Storm each owned 25% of AquaSport. In

---

* The Honorable William H. Timbers, Senior Judge, United States Court of Appeals for the Second Circuit, sitting by designation.

1. Neither Mr. White nor Mr. Keim is related to the Storms. Mr. Keim was an employee of taxpayer during the tax years at issue.

2. The officers and directors of taxpayer and Storm from 1972 until present are as follows:

| | Taxpayer | Storm |
|---|---|---|
| Gary | Vice President and Treasurer (1–1–72 to 8–18–72) Director (1–1–72 to 8–18–72) | President and Treasurer (1–1–72 to present) Director (1–1–72 to 12–31–75) |
| William | President (1–1–72 to present) Director (1–1–72 to present) | Assistant Secretary (1–14–75 to present) Director (1–1–72 to 12–31–75) |
| Richard | Vice President and Treasurer (1–18–72 to present) Secretary (1–1–72 to present) Director (1–1–72 to 9–6–74) | Vice President (1–1–72 to present) Assistant Secretary (1–1–72 to 12–31–74) Secretary (1–14–75 to present) Director (1–1–72 to 12–31–75) |
| Imogene | Secretary (1–1–72 to 1–1–75) | Secretary (1–1–72 to 1–1–74) Director (1–1–72 to 12–31–75) |
| White | Director (8–18–72 to present) | |
| Keim | Vice President and Assistant Secretary (8–18–72 to present) Director (9–6–74 to present) | |

1975, AquaSport changed its name to Tubby Tackle, Inc. During the tax years, the Storms also occupied key positions in AquaSport/Tubby Tackle.[3]

Sales of taxpayer's lures during the tax years at issue were as follows:

NUMBER OF LURES

| Buyer | 1972 | 1973 | 1974 | 1975 |
|-------|------|------|------|------|
| Storm | 564,618 | 586,306 | 617,688 | 339,837 |
| Tubby | —0— | —0— | —0— | 91,986 |
| Norman | 7,608 | 432 | —0— | —0— |
| Glitterfin | 1,320 | 18,240 | 492 | —0— |
| Scott | 76 | —0— | —0— | —0— |
| Young | —0— | —0— | —0— | 380 |

Norman, Glitterfin, Scott, and Young are not related to taxpayer R. Vol. I at 95. Sales to them accounted for 1.53% of taxpayer's sales in 1972, 3.09% in 1973, .08% in 1974; and .09% in 1975. R. Vol. I at 95; R. Vol. III at 17–18, 282.

From the date of separation of the manufacturing and distribution functions until the present, taxpayer sought to maintain itself and Storm as separate entities. Although taxpayer and Storm occupied the same building, the actual physical space occupied by them was separated by concrete walls, except for "warehouse" areas, where inventories, though not separated by walls, were separated by rows of shelving. R. Vol. I at 89; ¶ 23. Taxpayer and Storm had separate books, financial and corporate records, bank accounts, safe deposit boxes, telephone numbers, stationery, invoices, purchase orders, rental agreements, post office boxes, street and mailing addresses, and insurance (with some overlap in insurance). *Id.* at 89–91; ¶¶ 25, 27–33. Furthermore, the same efforts to maintain a separate identity were followed by taxpayer vis-a-vis Tubby Tackle.

**3.** The officers and directors of AquaSport/Tubby Tackle were as follows: William was treasurer and a director; Gary was secretary and a director; Richard was president, chairman, and a director; and Imogene was Vice-President and Assistant Secretary.

**4.** Section 4161 provides, in relevant part, as follows: "There is hereby imposed upon the sale of ... artificial lures, ... a tax equivalent to 10 percent of the price for which so sold."

In setting prices for the lures it would sell to Storm, taxpayer first negotiated a price with Bill Norman of Norman Manufacturing Company. Bill Norman is unrelated to any of the Storms. Richard Storm testified that the design and manufacturing costs of the lures sold to Norman—the Flash Shad lure—were materially similar to the lures sold to Storm—the Thin Fin lure. R. Vol. III at 263–265. After negotiating a price for Flash Shad lures with Norman, the same price was quoted to and accepted by Storm for the Thin Fin lure. R. Vol. I at 92, ¶ 36. It was upon this price that taxpayer computed its manufacturers excise tax liability imposed by 26 I.R.C., 26 U.S.C. § 4161.[4]

The Internal Revenue Service (Service) recomputed taxpayer's excise tax liability on the basis of the resale price which Storm charged its customers, rather than the price taxpayer charged Storm. In doing so, the Service relied upon an audit report of taxpayer filed by Revenue Agent Horn. Agent Horn testified that he relied upon 26 I.R.C., 26 U.S.C. § 4216 and its accompanying treasury regulations, a series of revenue rulings, and *Columbia Products Company v. United States*, 404 F.Supp. 276 (D.S.C.1975), in concluding that the price upon which taxpayer's excise tax should be computed was Storm's resale price. R. Vol. III at 282–286; 307–315. Agent Horn stated that, based upon these materials and upon the facts of this case, it was unnecessary for the Service to make an actual determinations of whether the prices charged by taxpayer to Storm for Thin Fin lures constituted the "fair market price" of those lures under 26 I.R.C., 26 U.S.C. § 4216.[5] *Id.* at 286.

**5.** 26 I.R.C., 26 U.S.C. § 4216 provides, in relevant part, as follows:
(b) CONSTRUCTIVE SALE PRICE
(1) IN GENERAL—If an article is—
(A) sold at retail,
(B) sold on consignment, or
(C) sold (otherwise than through an arm's length transaction) at less than the fair market price,
the tax under this chapter shall (if based on the price for which the article is sold) be computed on the price for which such articles were sold,

At trial, the Service's position was the same as was Agent Horn's—namely, that to determine the tax base for purposes of the excise tax it was only necessary to "look to the first sale outside the related family group...." R. Vol. III at 361. The Service justified this method of excise tax computation by arguing that "the I.R.S. doesn't have the personnel, the manpower to go out at each level of commerce and make a determination of fair market value to evaluate the quality of each lure to say how much that lure is worth." *Id.* at 364. Although the district court held generally for the government, we are concerned with the lack of findings made by the court in upholding the deficiency. Our concerns should become evident from the text of the opinion.

## Discussion

Section 4216(b)(1)(C), the statute at issue in this appeal, empowers the Service to construct a sales price for purposes of computing taxpayer's excise tax obligation. By the plain terms of § 4216, the Service is empowered to construct a price only if the articles in question are sold otherwise than through an arm's length transaction and at less than fair market value. The treasury regulation interpreting this provision states that "a sale is considered to be made under circumstances otherwise than at 'arm's length' if: (1) One of the parties is controlled (in law or in fact) by the other or there is common control, whether or not such control is actually exercised to influence the sale price ...," but the regulation does not interpret the term "fair market value." Treas.Reg. § 48.4216(b)-2.

In 1962, the Service issued Revenue Ruling 62-68, which disclosed the Service's methodology for constructing sale prices under 4216(b)(1)(C). Rev.Rul. 62-68, 1962-1, Cum.Bull. 216. In 62-68, it is assumed that the transaction between the manufacturer and the selling company is not at arm's length and not for fair market value. Under these circumstances, the Service states that the taxpayer may elect to use as a basis for the tax a constructive sale price equal to 95% of the selling company's lowest established resale price of the articles to unrelated wholesale distributors. If the election is not made, the tax basis is the actual wholesale price at which the selling company sells to unrelated customers.

Revenue Ruling 71-240 amplified 62-68 to provide that any intercompany sale price which is less than 95 percent of the selling company's lowest established resale price to unrelated wholesale distributors is *presumed* to be less than fair market value. Rev.Rul. 71-240, 1971-1, Cum.Bull. 372. Revenue Ruling 71-240 was in turn modified by Revenue Ruling 76-182, 1976-1, Cum.Bull. 343, to provide that the 95% rule is rebuttable. Finally, according to the Service, Revenue Ruling 77-66, 1977-1, Cum.Bull. 338, modified 76-182 to provide that the 95% rule is rebuttable only when the manufacturer makes sales to unrelated wholesale distributors.

In *Columbia Products,* relied upon here by Agent Horn and the Service in determining that taxpayer was liable for a deficiency, Columbia Products Company, a wholly-owned subsidiary of Shakespeare Company, manufactured fishing rods which it in turn sold to Shakespeare. Columbia charged Shakespeare for the rods 20 to 30 percent of Shakespeare's "recommended list price." Shakespeare then resold the rods to both wholesale and retail dealers for a price which varied from 37 to 45 percent of its suggested retail price. In computing Columbia's excise tax deficiency, the court had before it Revenue Rulings 62-68 and 71-240. Although 71-240 was not in effect for the tax years at issue, the Service relied upon it and the court considered it indicative of the theory upon which the excise deficiency was based.[6]

in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Secretary.

6. In the present appeal, taxpayer does *not* argue that certain of the revenue rulings utilized by the Service in computing taxpayer's deficiency were improperly utilized because they also were not in effect during the tax years at issue.

404 F.Supp. at 280 n. 4. In fact, the court considered the presumption in 71–240 a "logical corollary" of the constructive price rules established in Revenue Ruling 62–68. *Id.* at 281. According to the court, a Senate Finance Committee report relating to a constructive price provision added to § 4216—not relevant to the present dispute—by the Excise, Estate, and Gift Tax Adjustment Act of 1970 clearly expressed Congress' awareness of the administrative difficulties encountered by the Service in attempting to determine "fair market price." The court reasoned that Congress' expressed concern for the Service's administrative difficulties justified the Service's methodology expressed in 71–240. *Id.* at 283. The court therefore concluded that it was reasonable for the Service to utilize Shakespeare's resale price as the best indicator of fair market price.

In the committee report referred to by the court in *Columbia Products*, Congress clearly approved of the constructive price procedures described in 62–68:

> The committee in providing the new rule specified in this bill does not mean to imply that it regards Revenue Ruling 62–68, described above, as being an unreasonable exercise of the Commissioner's discretion under the basic constructive *sale* price provision in those cases where none of the new constructive sale price rules apply.

S.Rep. No. 91–1444, 91st Cong., 2d Sess. (1970), 1970 U.S.Code Cong. & Admin. News 5689, 5710. However, the same report, although not disapproving of the Service's use of the constructive price provisions in 62–68 to presume fair market value, stated unequivocally that the presumption was rebuttable:

> Although the committee has changed the rules provided in present law to make clear that they are constructive sale price rules and has also added a provision specifying another constructive sale price rule, it recognizes that in many situations it is difficult, if not impossible, for the Internal Revenue Service to determine a "fair market price." Such a de-

termination is necessary since (under sec. 4216(b)(1)) the constructive sale price rules are applicable only if there are sales at less than "fair market price." *In the case of sales between related parties, however, unless another "fair market price" is clearly applicable,* the committee believes that it is reasonable for the Internal Revenue Service to use the constructive sale price rules provided by these three provisions in determining what constitutes the "fair market price" for purposes of the sales involved.

*Id.* (emphasis added). And, in fact, based upon the italicized language in the committee report, the Service modified 71–240 to provide that the presumption is rebuttable. Rev.Rul. 76–182.

Turning, then, to a consideration of the issues in the present case in light of this background, the first question is whether the district court correctly found that the sales between taxpayer and Storm were not at arm's length. The district court specifically found "that there [was] no arm's length transaction in fact or in law," R. Vol. III at 369, and that "everything points in the direction that this is really a controlled situation."

■ Although the court's oral findings make it difficult to determine what evidence it relied on to find control and what evidence it relied on to find that the prices charged Storm were not fair market prices, the court did refer to evidence that: (1) the "same people" ran taxpayer and Storm; (2) taxpayer hired no salesman; and (3) taxpayer's profits were substantially less than Storm's. Although, as noted earlier, the stipulations reveal that taxpayer went to great lengths to maintain its separateness from Storm and Tubby Tackle, we cannot hold that the district court's finding of control is clearly erroneous, even though we might have decided the issue differently. *See Anderson v. City of Bessemer City, North Carolina,* —— U.S. ——, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). The court might reasonably have inferred from the evidence to which it referred that taxpayer and Storm's interests were not ad-

verse. *See Creme Manufacturing Co. v. United States,* 492 F.2d 515, 520 (5th Cir. 1974).

That the relationship between taxpayer and Storm was a controlled situation does not, as our review of the authorities indicates, necessarily render taxpayer liable for excise tax deficiencies. We must also consider whether taxpayer's sales to Storm were at less than a fair market price. The Service argued in the district court, and now on appeal, that, because taxpayer's sales to unrelated wholesalers were *de minimis,* the presumption of Revenue Ruling 77–66 applies and it was therefore unnecessary for it to determine whether in fact taxpayer's sales to Storm were at fair market prices. The Service's position essentially is that because these sales amounted to such a small percentage of taxpayer's total sales, they should be disregarded.

■ We disagree. Congress' expressed intent in Sen. Report No. 91–1444 was that the presumed sale price constitute the fair market price *unless* another price was "clearly applicable." Congress was concerned that the Service not have to go into the market to attempt to determine fair market prices. For that reason, Congress considered it reasonable to put the burden on the taxpayer to come forward with "industry data"; if taxpayer failed to do so, or if the information supplied by it did not overcome the presumption, then the constructive price would be the fair market price. S.Rep. No. 91–1444. For this reason, sales to unrelated sellers, though small in quantity, are relevant, if made regularly, to a determination of whether sales to the related seller are at a fair market price. *Cf. Shakespeare Company v. United States,* 419 F.2d 839, 844 (Ct.Cl. 1969), *cert. denied,* 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970) (construing § 4216(b)(2) not to require that sales to wholesalers be in large quantities).

■ It follows from this discussion that the Service's attempt to apply Ruling 77–66 to limit the instances in which a taxpayer may rebut the presumption is con-

trary to the manifest intent of Congress. And, indeed, 77–66 by its own terms does not apply to the present case because it concerns § 4216(b)(3), (4), and (5); we are here concerned only with § 4216(b)(1). Revenue rulings do not have the force and effect of law, but rather are offered for the guidance of taxpayers, IRS officials, and others concerned; although they are entitled to some consideration, they do not control when contrary to statute or the expressed intention of Congress. *Merchants Industrial Bank v. C.I.R.,* 475 F.2d 1063, 1064 (10th Cir.1973); *Propstra v. United States,* 680 F.2d 1248, 1256 (9th Cir.1982). Our conclusion that 77–66 does not manifest the intent of Congress thus mandates rejection of it as a guide to determining fair market price.

Having rejected the Service's view that the presumption in 77–66 precludes taxpayer here from demonstrating that another price is clearly applicable, we must now consider whether the district court applied the presumption. The district court did find "that there is no fair market price established on the level that the plaintiff here would like to have it established here." R., Vol. III at 369. As we have observed, however, the district court's oral findings leave much to be desired. This is especially true with regard to its finding that no fair market price was established. The one specific finding made by the court on the fair market price issue was in response to an argument by taxpayer's counsel that the prices charged unrelated third parties for similar lures were comparable:

THE COURT: There is one thing that I disagree with you here. You have not proved that the lures were of equal quality. It's my finding beyond any purview of a doubt that [taxpayer's] product is superior to any of these others by reputation, its name, everything about it. None of the witnesses testified to the contrary. They all said it was a good product. It's one of the leaders. So that is one statement you made that I'm go-

ing to decide now. Go ahead with your argument.

*Id.* at 359–360.

If the record substantiated this finding, we would be inclined to uphold the district court, even though certain statements made by the court, as well as a general reading of the court's findings, suggest that the court was applying the 77–66 presumption. *E.g., id.* at 212 ("THE COURT: Counsel for the government so stipulates [that the testimony would reflect that the lures sold for a fair market price], and I have heard enough of it. I don't think it makes any difference anyhow under my view of this case now after looking at the authorities"); and 370–371. We would thus give the court the benefit of the doubt that, in holding for the government, it was relying on its finding, rather than the presumption. The court's finding, however, is erroneous for two reasons.

■ First, rather than basing its finding that taxpayer's lures are superior on the evidence, the court improperly substituted its own independent appraisal as to the quality and reputation of taxpayer's lures:

> MR. APPLEMAN: Well, your Honor, I respectfully disagree [with the court's finding that taxpayer's lures are superior] and say—
>
> THE COURT: No, you don't. You're not going to run your client's product down unless it's a bad product, and you have got a good product here. *I have seen this product over the years when somebody over in Arkansas was trying to copy it, because it was such a good product.*

*Id.* at 360 (emphasis added). In the italicized language, the court apparently was referring to a patent infringement suit involving taxpayer's lures—a suit which did not go to trial. Although Fed.R.Evid. 201(c) specifically empowers federal courts to take judicial notice of "adjudicative facts," we must conclude that the district court's personal appraisal of the quality and reputation of taxpayer's lures, derived from the court's personal knowledge of a prior case that did not go to trial, is a fact neither "(1) generally known within the territorial jurisdiction of the trial court [nor] (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). *See also Brady v. Beams,* 132 F.2d 985 (10th Cir. 1942).

■ Second, the district court's finding that taxpayer's lures were superior to other lures and for that reason commanded a premium in the marketplace is simply contrary to the unrefuted trial testimony. Although all of taxpayer's witnesses testified that taxpayer's lures were quality lures[7], the unrefuted testimony at trial was that taxpayer's lures did not command a premium in the marketplace. R. Vol. III at 178 (testimony of James D. Maxwell, owner of Maxwell Manufacturing Company, fishing tackle manufacturers); at 185 (testimony

7. The Service did not argue at trial, and does not argue on appeal, that Rev.Rul. 63–238, 1963–1, Cum.Bull. 519, controls on the issue of whether the lures are comparable to Norman Manufacturing's lures, although agent Horn referred to 63–238 in his testimony and stated that he relied upon it. Rev.Rul. 63–238 provides that in "private brand" transactions the fair market price for sales from a manufacturer to its related seller cannot be computed by reference to prices charged by the same manufacturer to unrelated sellers for similar articles. Private brand sellers sell the manufacturer's articles under their (the private brand sellers') own name. Because private brand sellers generally are the ones who incur the advertising, selling, and distribution costs, rather than the manufacturer, its costs and hence its prices are lower. For this reason, the Service stated in 63–238 that it would not consider the private brand sales evidence of fair market price. Although we are concerned that 63–238 has the same effect of 77–66 in that it precludes the taxpayer from demonstrating another price is "clearly applicable," we prefer to conclude that the Service simply did not rely on 63–238, which would explain the Service's positive reference in its brief to the district court's finding that the lures were not comparable. Brief of the Appellee at 22. Although Norman Manufacturing is a private brand seller of taxpayer's lures, we note also that the district court disregarded the parties' stipulation that taxpayer advertised its lures in "The Sporting Goods Directory," a trade publication, every year beginning in the fall 1971–1972 issue. R. Vol. I at 95, ¶ 41.

of James A. Smithwick, president of Smithwick Lures); at 202 (testimony of Howard Berch, formerly owner of a lure manufacturing company); and at 210 (testimony of Oliver Mercer, formerly owner of a lure manufacturing company). Furthermore, as noted above, the Service stipulated that these witnesses would testify that in their opinion the prices charged Storm were fair market prices; the Service entered into such a stipulation apparently because its position throughout the trial was that "the I.R.S. is not going to go out and determine fair market value."

Thus, assuming that the district court did not apply the 77–66 presumption in this case, nevertheless we are constrained to hold, as a matter of law, that the court erred in determining that taxpayer's lures were not sold for a fair market price by improperly taking judicial notice of an unrelated patent infringement case and by disregarding the unrefuted testimony that taxpayer's lures were sold at a fair market price. This is not a case then in which the trial judge's findings are based upon his decision to credit the testimony of one witness over the other, *see Anderson*, —— U.S. at ——, 105 S.Ct. at 1512–13; rather, this is a case in which the trial judge simply did not apply the unrefuted evidence to the governing law.

In view of the unrefuted evidence of fair market price, we hold that the taxpayer carried its burden of rebutting the presumption that the constructive price established in Rev.Rul. 62–68 is the fair market price for its lures. Accordingly, the judgment of the district court is REVERSED.

