**UNITED STATES COURT OF APPEALS**
**Tenth Circuit**
**Byron White United States Courthouse**
**1823 Stout Street**
**Denver, Colorado 80294**
**(303) 844-3157**

Patrick J.  Fisher, Jr.                                              Elisabeth A. Shumaker
Clerk                                                                    Chief Deputy Clerk

March 23, 1999


**TO:**  ALL RECIPIENTS OF THE OPINION

**RE:**  97-9025, *American Stores v. CIR*
Filed on March 9, 1999

The slip opinion filed on March 9, 1999, contains two typographical errors. On page 6, the first sentence of the last paragraph should read:

Furthermore, American concedes that the Code prohibits the use or citation of Private Letter Rulings and Technical Advice Memoranda as precedent.   <u>See</u> I.R.C. § 6110(k)(3).

On page 15, the third sentence of the first paragraph should read:

It also argues that the language and mechanism of the deduction limitation statute, § 413(b)(7), contemplates this result.

A copy of the corrected opinion is attached.

Sincerely,
Patrick Fisher, Clerk of Court


By:   Keith Nelson
Deputy Clerk


encl.

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 9 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

AMERICAN STORES COMPANY
AND SUBSIDIARIES,

  Petitioner - Appellant,

  v.

COMMISSIONER OF INTERNAL
REVENUE,

  Respondent - Appellee.

No. 97-9025

---

**APPEAL FROM THE JUDGMENT OF**
**THE UNITED STATES TAX COURT**
**(T.C. NO. 19182-94)**

---

Paul J. Sax (Richard E.V. Harris and Richard A. Gilbert with him on the briefs),
Orrick, Herrington & Sutcliffe, LLP, San Francisco, California, for petitioner.

Kenneth L. Greene (Steven W. Parks with him on the brief), Tax Division, United
States Department of Justice, Washington, D.C., for respondent.

---

Before **ANDERSON** , **HOLLOWAY** , and **BALDOCK** , Circuit Judges.

---

**ANDERSON** , Circuit Judge.

---

American Stores Company and Subsidiaries (American) appeals the

decision of the United States Tax Court sustaining the Commissioner's

disallowance of deductions on its 1988 tax return for more than 12 months' contributions to qualified multiemployer defined-benefit pension plans, and deductions on its 1987 and 1988 tax returns for certain amounts attributed to vacation pay. It also alleges that the Tax Court erred when it denied American's motions for reconsideration, judicial notice of various administrative materials, and a hearing on those motions. We affirm.

## I. BACKGROUND

American Stores is an accrual-method taxpayer, using a 52-53 week taxable year ending on the Saturday nearest the last day of January. Upon audit of its returns for the years 1987 and 1988, the Commissioner of Internal Revenue, among other things, disallowed certain deductions for contributions to multiemployer defined-benefit pension plans for 1988, and for certain alleged vacation pay liabilities for 1987 and 1988. Thereafter, the Commissioner issued a statutory notice of deficiency, proposing additional taxes resulting from these disallowed deductions. American filed a petition in the Tax Court seeking a redetermination of the proposed deficiencies, and the case was submitted on facts which were fully stipulated by the parties.

The Tax Court issued an opinion upholding the position of the Commissioner. <u>American Stores Co. and Subsidiaries v. Commissioner</u>, 108 T.C.

No. 12 (Mar. 31, 1997). The court held that pension contributions made pursuant to collective bargaining agreements that were based on units of service worked after the close of American's 1988 fiscal taxable year were not "on account of" that year, as required by § 404(a)(6) of the Internal Revenue Code (Code), and therefore were not deductible in that year.[1] In addition, the court held that vacation pay based on units of service worked after the close of American's 1987 and 1988 fiscal taxable years, respectively, had not been "earned" in those years, as required by § 463 of the Code.

On May 30, 1997, American filed a motion for reconsideration and a request for judicial notice of various memoranda, rulings, and other Internal Revenue Service materials allegedly supporting American's position regarding the deductibility of pension plan contributions. Those motions were denied, without a hearing, on June 10, 1997, and the Tax Court entered its decision on October 8, 1997.

On appeal, American reurges the arguments it advanced in the Tax Court, and requests this court independently to take judicial notice of the materials unsuccessfully proffered to the Tax Court after its decision.

---

[1]The court also concluded that American's deductions violated the "individual deduction limits of section 404(a)(1)(A) and section 413(b)(7)." American Stores, slip op. at 27. This conclusion was unnecessary to its decision and, as we explain below, incorrect.

-3-

## II. DISCUSSION

Our review of the issues relating to the pension plan and vacation pay deductions is de novo, requiring only determinations of law. See Schelble v. Commissioner , 130 F.3d 1388, 1391 (10th Cir. 1997). Our review of the Tax Court's denial of American's post-trial motions is essentially for abuse of discretion, see York v. American Tel. & Tel. Co. , 95 F.3d 948, 958 (10th Cir. 1996) (judicial notice); Herr v. Heiman , 75 F.3d 1509, 1515 n.1 (10th Cir. 1996) (reconsideration), although American also contends that under the Federal Rules of Evidence and the Due Process Clause of the Constitution the Tax Court erred as a matter of law in its post-trial rulings, including its refusal to hold a hearing.

### A. Pension Plan Contributions

American Stores has filed a motion asking this court to take judicial notice of various documents, including redacted copies of unpublished Private Letter Rulings and unpublished Technical Advice Memoranda issued by the IRS to other taxpayers; [2] documents purporting to identify the taxpayers and pension plans involved; excerpts from IRS manuals and other IRS administrative materials; declarations signed by counsel for American; and legal correspondence with

---

[2]Some of these rulings and memoranda are already before us in the record as joint exhibits; as regards these documents, judicial notice is unnecessary.

counsel for the Commissioner. American asks us to take judicial notice that these materials demonstrate that IRS administrative practice has been consistent with American's position in this litigation, and that the IRS is guilty of various misrepresentations regarding its administrative practice. Because of American's heavy reliance on this material through its briefs and in oral argument, we are constrained to address the motion as a threshold matter.

"A judicially noticed fact must be one not subject to reasonable dispute," in that it is either "generally known" or that it is "capable of accurate and ready determination." Fed. R. Evid. 201(b). American's characterizations of IRS administrative practice are certainly not such facts. Nor are its allegations of misconduct. Furthermore, the rulings and memoranda which allegedly support these supposed facts are themselves inappropriate for judicial notice, in that by their very nature they are unpublished rulings issued to private taxpayers. See 21 Charles Alan Wright and Kenneth W. Graham, Jr., Federal Practice and Procedure § 5106, at 500 (1977) ("ready determination" means source of judicially noticed facts must be "widely available"); cf. United States v. Judge, 846 F.2d 274, 276-77 (5th Cir. 1988) (refusing to take judicial notice of excerpts from DEA Manual).

American's request for judicial notice is essentially an attempt to introduce evidence after judgment. As indicated, American argues that the private rulings

and memoranda constitute evidence of administrative practice, evidence of the reasonableness of its interpretation of the law, and evidence usable for impeachment and rebuttal. Appellant's Reply Br. at 7-8. If so, it was American's obligation to offer them in evidence in the Tax Court, and to subject them to argument and rulings as part of its case. Judicial notice is "not [a] talisman[] by which gaps in a litigant's evidentiary presentation . . . may be repaired on appeal." City of New Brunswick v. Borough of Milltown, 686 F.2d 120, 131 n.15 (3d Cir. 1982); see also Melong v. Micronesian Claims Comm'n, 643 F.2d 10, 12 n.5 (D.C. Cir. 1980).

Furthermore, American concedes that the Code prohibits the use or citation of Private Letter Rulings and Technical Advice Memoranda as precedent. See I.R.C. § 6110(k)(3). It is well settled that they do not bind the Commissioner or this court. See ABC Rentals of San Antonio, Inc. v. Commissioner, 142 F.3d 1200, 1207 n.5 (10th Cir. 1998); cf. Dickman v. Commissioner, 465 U.S. 330, 343 (1984). Accordingly, we deny American's motion for judicial notice and decline to consider the proffered rulings and memoranda in evaluating the legal arguments of the parties.

In a related argument, American contends that the Tax Court abused its discretion when it denied American's motions for reconsideration, for judicial notice, and for a hearing, all relating to these same documents and the same

-6-

arguments based on them made by American here. These were post-trial motions made two months following the Tax Court's opinion. In support, American argued that the material was necessary not only as evidence of administrative practice and the correctness of its legal position at trial, but to rebut allegedly misleading and improper statements by counsel for the Commissioner in a reply brief.

In addition to the same points made above regarding when judicial notice is proper, limitations on the use of private rulings and memoranda, and the obligation to introduce evidence during trial and not afterward, American's argument has three defects. First, it was generally on notice of the Commissioner's position regarding these rulings prior to the reply brief in question, since the subject was at least broached in the Commissioner's opening brief. See R. Vol. I, Doc. 19 at 135. Second, whatever counsel for the Commissioner may have represented or argued in a brief, it was not evidence. It was only argument, and the Tax Court was obligated to treat it as such, i.e., not part of the evidentiary record. Finally, and most significantly, after the Tax Court received the post-trial motions, it was in a position to exercise discretion as to whether, considering the materials, it must reconsider its decision. It did not deem reconsideration warranted, or the materials proper for addition to the trial

record after a decision was issued. We decline to call its denial of the motions an abuse of its discretion.

Nor did the court err by refusing to hold a formal hearing on the matter. Fed. R. Evid. 201(e) provides as follows:

> A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.

Two factors lead us to conclude that American was not entitled to a hearing as a matter of law. First, the rule by its terms does not specify that the "opportunity to be heard" means, under all circumstances, a formal hearing. Second, although "[t]he Rule as written is not limited to a party who is opposing the taking of judicial notice," 21 Wright & Graham § 5109, at 516, the last sentence of the rule implies special concern with the right to object, which must be honored even after the fact if the court has acted without first notifying the adversely affected party. See Fed. R. Evid. 201(e) advisory committee's note. Obviously such a right is not implicated here. Therefore, in the absence of more explicit authority, we do not read the rule to require a court under all circumstances to hold a formal hearing every time a  proponent  of judicial notice so demands.    To the extent American as such a proponent had a right to be heard, the court honored that right by duly considering American's briefs, which under the circumstances were sufficient to present its position.

We proceed, then, to our analysis of the issues based upon the evidence of record.

2.

The Code contains special provisions for the tax treatment of "qualified" pension plans, i.e., plans that meet the various requirements of § 401(a). During the years at issue, American made contributions to 39 qualified multiemployer defined-benefit pension plans. By definition, multiemployer plans are maintained pursuant to collective bargaining agreements, and benefit unionized employees. See 29 U.S.C. § 1002(37)(A). A multiemployer plan is jointly administered by the involved unions and the participating employers. Each plan pools the contributions of multiple employers on behalf of employees who belong to particular unions, in order to provide funding for a predetermined level of pension benefits. Employers who join multiemployer plans are statutorily obligated to make the payments required by the corresponding collective bargaining agreements. See 29 U.S.C. § 1145.

For all taxable years prior to 1988, American's subsidiaries used one of two methods to calculate pension plan deductions: some would deduct only those contributions actually paid during the taxable year; others would deduct only those contributions corresponding to work done during the taxable year, including

one payment made after the close of the taxable year, corresponding to work done during the last month. Under each method, the sum of twelve payments was deducted each year.

For the taxable year ending January 30, 1988, however, American deducted not only the typical twelve payments, but also seven (and in some cases eight) additional payments made after the close of the taxable year, but before the filing of its return on October 17, 1988 (American had applied for and received a filing extension). These additional payments were calculated based on work performed by covered employees after the close of the taxable year. The net result was a one-time tax benefit by accelerating up to eight months of additional deductions, claiming up to twenty months of contributions for the twelve-month fiscal taxable year 1988.

More than 1,000 employers contributed to some of the plans at issue here; other plans were smaller. Generally, at the end of each month, the plan administrators sent bills to participating employers, and employers would calculate their required contributions to each plan by multiplying the units of service (e.g., hours or weeks) worked by covered employees in such month by fixed monetary rates set by the applicable collective bargaining agreements. See H.R. Rep. No. 96-869, at 53 (1980), reprinted in 1980 U.S.C.C.A.N. 2918, 2921 (under multiemployer pension plans maintained pursuant to collective bargaining

agreements, the parties "normally agree to contribute at rates specified in such agreement(s) for hours worked by employees, units of production . . . , or a percentage of compensation"). For example, under its collective bargaining agreement with the Teamsters union, American was required to make contributions at the rate of $0.63 for each hour worked up to a maximum of $25.20 per week per employee. The employers included with payment a list of covered employees, information regarding the number of covered hours of service performed by such employees during the previous month, and the resulting calculations of the amount of the contribution required. Contributions based on services performed within a particular month were due at the end of the following month.

Although there was no provision in any of the collective bargaining agreements providing expressly that American was prohibited from contributing more than the amount required under the agreements, or from contributing amounts in advance of the date that such amounts became due, there also was no provision in the collective bargaining agreements which explained how plan administrators were supposed to handle or credit an advance contribution from an employer. The plan administrator for the Northern California Retail Clerks' Employee Benefit Fund testified that because advance contributions generally were not made, the plan had no established procedures to handle advance

-11-

contributions, other than with respect to inadvertent overpayments due to computational errors, and contributions relating to vacation time and severance pay which could be calculated in advance. Other than the exceptions noted, the plan was "not able to handle advance payments," and the administrator had "no knowledge of an employer ever making advance payments." R., Joint Ex. 64-BL at 32. She testified that, because contributions to the plan were based on the number of hours worked in a particular month, which could not be determined in advance, payments to the plan for units of service to be worked in future months by covered employees were "not allowed." Id. The payments by American that are at issue in this case were, consistent with the procedures just described, made on a monthly basis, as required by the plans pursuant to the relevant collective bargaining agreements.

3.

The timing of deductions for contributions to qualified pension plans is governed by I.R.C. § 404. The general rule is that they are deductible "[i]n the taxable year when paid," I.R.C. § 404(a)(1)(A), effectively putting all employers on cash-method accounting with respect to such contributions. Unmodified, this rule would prevent some taxpayers from maximizing their contributions (and deductions), because some figures necessary for these computations (such as

hours worked by covered employees) are not available until after the close of the taxable year. See Don E. Williams Co. v. Commissioner, 429 U.S. 569, 575-76 (1977). To avoid this problem, § 404(a)(6) provides a limited exception:

> For purposes of [§404(a)](1), . . . a taxpayer shall be deemed to have made a payment on the last day of the preceding taxable year if the payment is on account of such taxable year and is made not later than the time prescribed by law for filing the return for such taxable year (including extensions thereof).

I.R.C. § 404(a)(6) (emphasis added). This exception was intended to provide a grace period during which employers could calculate and pay additional contributions for the preceding year. See Don E. Williams Co., 429 U.S. at 574-77 (detailing the history of § 404(a)(6)).

The parties' analytical approaches to this statute, and to the deductibility of the pension plan contributions in question, are galaxies apart. American focuses on the nature of the plan. Unlike defined-contribution plans, which maintain segregated employee accounts, multiemployer defined-benefit pension plans pool all money received and pay benefits according to plan terms. Funds in the pool are not traceable to individual employees or employers, or to the various taxable years of employers participating in the plan. Thus, reasons American, the employee-based terms in American's collective bargaining agreement for calculating monthly payments to the plan are irrelevant, and deductibility is not

-13-

tied to the concept of monthly obligations paid or accrued through the end of the year.

Under this theory, American could, for example, pay an estimated two or three years of pension contributions (subject to planwide limitations) in advance and deduct them in the year paid since, arguably, payments going into a pool bear no relationship to any particular month or year. In terms of this case, then, according to American, the fact that twenty (instead of just twelve) monthly payments are deducted in fiscal 1988 is perfectly acceptable. Under this argument, the only role played by § 404(a)(6) is to deem payments made during the grace period for filing the fiscal 1988 return as having been made on January 30, 1988, the last day of the taxable year. The section relates only to timing, not deductibility as such. American asserts that its position is supported by the limitation provisions of § 413(b) of the Code, and explicitly authorized by Rev. Rul. 76-28, 1976-1 C.B. 107.

The Commissioner, on the other hand, contends that § 404(a)(6) is a statute of narrow application, simply permitting time after the close of the tax year to calculate and pay liabilities based on services performed through the year end. It asserts that the plain language of the statute, "on account of such taxable year," compels this conclusion. It also argues that the language and mechanism of the deduction limitation statute, § 413(b)(7), contemplates this result. It asserts

support for these arguments from the monthly payment terms, requirements and mechanisms for billing and payment dictated by the collective bargaining agreements applicable to American and its employees, and from the way the pension plan trustees actually handle payments. From this perspective, the Commissioner reasons that the deductibility of American's pension plan payments is limited to the twelve monthly payment obligations under the collective bargaining agreement paid or accrued through the end of the taxable year. Furthermore, the Commissioner disputes American's argument that Rev. Rul. 76-28 permits the deduction in question.

Only one circuit has addressed the issue and disparate conceptual positions presented here, and it held in favor of the Commissioner. Lucky Stores, Inc. v. Commissioner, 153 F.3d 964 (9th Cir. 1998). In Lucky the Ninth Circuit reasoned that "[t]he bare language" of § 404(a)(6) precluded the deduction of post-taxable year payments required under collective bargaining agreements for hours worked after the close of the taxpayer's taxable year. 153 F.3d at 966. It further determined that these payments did not satisfy Rev. Rul. 76-28 because "the seven or eight contributions in issue were treated by the plans as payments satisfying Lucky's [post-taxable year] obligations." Id.

**4.**

-15-

**a.**

Distilled to its essence, the issue we are asked to resolve is whether the contested pension plan payments are "on account of" American's 1988 fiscal taxable year. The starting point for our analysis is the underlying purpose of § 404(a)(6). As we have explained, qualified pension plan contributions are deductible only within certain limits, and often these limits cannot be calculated until after the close of the taxable year. Section 404(a)(6) allows a grace period during which employers can calculate and make the maximum deductible pension plan contribution. It creates a fiction, by treating a post-taxable year payment as though it were made on the last day of the taxable year. Two other Code sections, dealing with the same need for a grace period and creating the same fiction, use language similar to that employed in § 404(a)(6): § 192(c)(3) (deductibility of contributions to black lung benefit trusts) and § 219(f)(3) (deductibility of contributions to individual retirement accounts (IRA's)). Each of these sections deems contributions made before the filing of the taxpayer's return to have been made on the last day of the preceding taxable year, so long as such contributions are "on account of" that taxable year. We interpret § 404(a)(6) in the context of these other provisions.

Section 404(a)(6), like § 192(c)(3) and § 219(f)(3), allows a taxpayer to backdate its grace-period contributions for purposes of complying with deduction

limits. Given this function of § 404(a)(6), we conclude that the requirement that grace-period contributions must be "on account of" the taxable year for which they are deducted is simply a demand that the payment fit the fiction. A grace-period payment "on account of" the prior taxable year must, for the purpose of calculating compliance with maximum deduction limits, be treated as though it had been made on the last day of that year.

This is an obvious proposition when viewed in the context of IRA's and § 219, for example. After the end of the taxable year, a taxpayer might use the grace period to calculate the maximum deduction allowed, e.g., $2000. If the taxpayer then made a $2000 contribution to an IRA before filing a return, the taxpayer could choose to designate that payment as "on account of" the previous taxable year, and as a result would subject it to that year's deduction limit (and not the deduction limit for the taxable year in which it was actually paid). Because the taxpayer alone will benefit from contributions to the IRA, there is usually a tax incentive to contribute the maximum amount deductible each year; the grace period makes this possible to the penny, without the need for guesswork. By the same token, there is absolutely no incentive for such a taxpayer to designate more than $2000 as "on account of" the previous year, because then the previous year's deduction limit would be exceeded.

The picture is similar in the case of an employer's contribution to a single-employer defined-benefit plan, for example. An employer may have discretion to fund within a specific range each year, bounded by a statutory minimum and a statutory maximum. See I.R.C. § 412, § 404(a)(1). An employer in such a plan may use the grace period to calculate the acceptable range, choose an amount within that range, and make a deductible payment designated as "on account of" the previous taxable year. Again, the single employer may choose to contribute the maximum, in order to claim a present deduction for funds which will later benefit its employees.

For contributors to multiemployer plans, the situation is similar in principle, but considerably more complex in application. Taking account of the fact that multiemployer plans receive scheduled contributions from numerous employers with differing taxable years, § 413(b)(7) sets up an anticipatory, agglomerative approach to calculating compliance with maximum deduction limits. For a period called the "plan year" (which may or may not coincide with each employer's taxable year), § 404(a) limits are calculated on a planwide basis and compared against anticipated (not actual) contributions for that plan year. Because of its importance to the issue at hand, we set § 413(b)(7) out in its entirety.

> Each applicable limitation provided by section 404(a) shall be
> determined as if all participants in the plan were employed by a

single employer. The amounts contributed to or under the plan by each employer who is a party to the agreement, for the portion of his taxable year which is included within such a plan year, shall be considered not to exceed such a limitation if the anticipated employer contributions for such plan year (determined in a manner consistent with the manner in which actual employer contributions for such plan year are determined) do not exceed such limitation. If such anticipated contributions exceed such a limitation, the portion of each such employer's contributions which is not deductible under section 404 shall be determined in accordance with regulations prescribed by the Secretary.

In other words, some employers whose taxable years differ from the plan year will file tax returns before the end of the plan year. Therefore, planwide compliance with deduction limits for the plan year is determined ex ante. At the beginning of the plan year, working from the terms of collective bargaining agreements and past contribution levels, the plan estimates what contributions it will receive "for such plan year." If that estimate is not greater than the planwide limit, every employer is then free, without any further determination and regardless of subsequent events, to deduct all the contributions it makes "for the portion of his taxable year which is included within such a plan year."

This scheme relies on the fact that, as § 413(b)(7) recognizes, both the timing and amount of actual employer contributions are determined by the plan, pursuant to the terms of the relevant collective bargaining agreements. Employers make only those payments required by the plan, because their employees receive a predetermined level of benefits independent of the particular amounts contributed

by a specific employer. Absent some non-business motive of extraordinary generosity, employers have no incentive to contribute in excess of what is required of them, even if the contributions were deductible, because such contributions would simply be pooled with all other contributions, and would not directly affect the benefits of its own employees.

American argues that the grace-period payments at issue are "on account of" its 1988 fiscal taxable year by the mere fact that they were claimed on its tax return for that year, and that therefore these payments are deemed to have been made on January 30, 1988. It contends that the timing of its own deductions need not coincide with the timing used by the plans to calculate compliance with deduction limits. It argues that once the plans (as required) calculated § 413(b)(7) anticipated contributions "in a manner consistent with the manner in which actual employer contributions for [the] plan year are determined" (i.e., according to units of service rendered during the plan year), and determined that deduction limits were not exceeded for the various plan years containing January 30, 1988, American properly took advantage of that fact by designating seven or eight months of subsequent contributions as having been made on that date. Quoting from the statutory language, it contends that under § 404(a)(6) a payment may be "deemed" made on the last day of an employer's taxable year, even though, by contrast, the plan calculates § 413(b)(7) compliance according to

"actual employer contributions." After all, it argues, the plan year need not coincide with employers' taxable years, and the plan need not and typically does not know the timing of each employer's deductions.

While such a disjunctive framework for limits on employer deductions is possible in theory, and may arguably be culled from the statute by focusing exclusively on certain words, we think a more comprehensive reading of the statute shows that Congress did not intend such an arrangement. Rather, as we have explained, the very purpose of including the "on account of" requirement in a statute such as § 404(a)(6) is to ensure that grace-period deductions claimed for a particular taxable year are in every respect subject to maximum deduction limits in the same way that a contribution made on the last day of the taxable year would be. The "on account of" requirement in § 404(a)(6) demands coordination where American postulates disconnection.

Because § 413(b)(7) requires plans to calculate planwide compliance with maximum deduction limits in advance, employers' contributions are effectively restricted by those limits only if a plan and its contributing employers use a common method for attributing payments to specific plan years and taxable years, respectively. The language of § 413(b)(7) implies such linkage. According to § 413(b)(7), once the plan determines that anticipated contributions " _for_ [the] plan year" (calculated by the same method as actual employer contributions " _for_

such plan year") are within the planwide limit, "the amounts contributed . . . by each employer . . . <u>for</u> the portion of his taxable year which is included within such a plan year" also satisfy deduction limits. The statutory scheme of § 413(b)(7) and § 404(a) is thus based on the assumption that an employer may deduct as contributions "for" a particular taxable year only those payments anticipated by the plan "for" the corresponding plan year(s). Although plans do not track the timing of employer deductions, a monthly bill means employers are well aware of plan methods for calculating actual contributions, and, therefore, anticipated contributions.

Consequently, an employer's grace-period payment to a multiemployer plan is "on account of" its previous taxable year only if a deduction for that taxable year is consistent with the plan's anticipatory treatment of the payment for purposes of § 404(a) and § 413(b)(7). [3] Each of the plans here was required,

---

[3]As American correctly notes, however, "the rules for the time a contribution is made for purposes of the minimum funding requirement of section 412 'are independent from' the rules relating to the time a contribution is deemed made for purpose[s] [of] claiming a deduction under section 404(a)(6)," effectively refuting the Commissioner's argument to the contrary. Appellant's Reply Br. at 19 (quoting Temp. Reg. § 11.412(c)-12(b)(2) and citing Rev. Rul. 77-82, 1977-1 C.B. 121). Indeed, as Rev. Rul. 77-82 recognizes, this must be so because the grace period under § 412 may be shorter than that under § 404(a)(6), leaving an interval during which a payment may be "on account of" a prior taxable year but attributed to the current year for purposes of minimum funding requirements. By contrast, the § 404(a)(6) grace period is integrally related to the calculation of compliance with maximum deduction limits under § 413(b)(7)

(continued...)

pursuant to § 413(b)(7), to calculate "anticipated employer contributions for [the] plan year" containing January 30, 1988, by considering only contributions attributable to services performed during the plan year, consistent with the method used to determine contribution obligations. Thus, as a participant in each of these plans, American may deduct as "on account of" its 1988 fiscal taxable year only those grace-period contributions which were attributable to services performed during its taxable year. The collective bargaining agreements' payment schedules are relevant not because they caused obligations to be accrued during the taxable year, [4] and not because "on account of" always means "on

_____

[3](...continued)
(which by its terms affects "[e]ach applicable limitation provided by section 404(a)").

[4]We are unconvinced by the Commissioner's argument that the "on account of" language embodies an accrual requirement. Prior to amendment by § 1013 of the Employee Retirement Income Security Act of 1974, 88 Stat. 923, § 404(a)(6) extended grace-period deductions only to accrual method taxpayers who had incurred a liability before the end of the taxable year. See Don E. Williams Co., 429 U.S. at 575 n.6. By extending the grace period to all taxpayers and by eliminating all references to accrual, we think Congress intended to allow those who have some discretion in the funding of their pension plans (such as in single-employer defined-benefit pension plans, where employers often do not have regularly scheduled funding obligations) to make the calculations necessary to exercise that discretion to its fullest. An accrual requirement would nullify this effect. Furthermore, looking at the similar language in § 219, for example, we do not think Congress intended for grace-period IRA contributions to be deductible only if the taxpayer had some obligation, incurred during the taxable year, to contribute to the taxpayer's own IRA.

Treas. Reg. § 1.404(a)-1(c), which the Commissioner cites in support of an
(continued...)

-23-

account of services rendered." [5]  Rather, the statutory scheme makes them relevant by designating "the manner in which actual employer contributions . . . are determined" as the method for calculating compliance with deduction limits.

American contends that "the plan provides the pension liability, not those [collective bargaining agreements]." Oral Arg. Tr. at 8.  By minimizing the effect of such agreements it seeks, for purposes of § 404(a)(6), to characterize all multiemployer plans and single-employer defined-benefit plans as birds of a feather.  Congress' inclusion of § 413(b)(7), which applies only to collectively bargained plans, directly contradicts American's arguments here and belies American's interpretation of § 404(a)(6).  Collective bargaining agreements are a sine qua non of multiemployer plans.  While American's pension plan obligations may transcend any particular collective bargaining agreements, Congress in enacting § 413(b)(7) relied on the fact that employers like American make

---

[4](...continued)
accrual requirement, was last amended in 1963, well before the current version of § 404(a)(6) was enacted.

[5]There is no indication that Congress intended to tie the deductibility of contributions to multiemployer plans to any one method of computing required contributions; multiemployer plans need not use a formula based on units of service rendered (although that was the method used by the plans here). Furthermore, given our observation that the "on account of" language appears in Code sections dealing with IRA's and black lung benefit trusts, we think it must refer to something more general than the performance of services during the taxable year, because contributions to an IRA or to a black lung benefit trust need not be "on account of" any particular services rendered during the taxable year.

payments on a regularly scheduled basis pursuant to such agreements, as statutorily required—quite unlike the often discretionary funding of many single-employer defined-benefit plans.

American argues that "Congress [i]ntended [s]ection 404(a)(6) to [a]pply to [a]ll [p]lans," Appellant's Br. at 32, and that disallowing the deductions in question negates the application of § 404(a)(6) to contributions to multiemployer plans. Here American attacks a straw man of its own making. The Commissioner does not argue that Congress intended to exclude multiemployer contributions from § 404(a)(6). In fact, the Commissioner (properly) conceded that American's February 1988 payments were "on account of" it taxable year ending January 30, 1988, because they corresponded to work done during January 1988. It is American's position that would treat multiemployer plans differently from other plans, by automatically allowing virtually unlimited deductions to fit under entirely disjunctive deduction limits.

American's arguments would make any grace-period contribution to a multiemployer plan deductible. As we have emphasized, the argument flies in the face of the entire purpose for a grace period. Congress enacted § 404(a)(6) because the predicate facts required for § 404(a) calculations are sometimes known only at the very end of the taxable year. The grace period is simply for making these calculations based on facts existing at the close of the taxable year.

The precise amounts of the payments American seeks to deduct here were based on predicate facts (i.e., hours worked during particular post-taxable year months) which did not exist at the end of the taxable year.

**b.**

American argues that Revenue Ruling 76-28 requires a contrary result. That ruling provides as follows:

> Whether a taxpayer is on the cash or accrual method of accounting, and whether or not the conditions for accrual otherwise generally required of accrual basis taxpayers have been met, a payment made after the close of an employer's taxable year to which amended section 404(a)(6) applies shall be considered to be on account of the preceding taxable year if (a)     the payment is treated by the plan in the same manner that the plan would treat a payment actually received on the last day of such preceding taxable year of the employer , and (b) either of the following conditions are satisfied.
>
> (1) The employer designates the payment in writing to the plan administrator or trustee as a payment on account of the employer's preceding taxable year, or
>
> (2) The employer claims such payment as a deduction on his tax return for such preceding taxable year . . . .

Rev. Rul. 76-28, 1976-1 C.B. 107 (emphasis added).

In analysis peppered with citations to Private Letter Rulings and the like, American interprets Rev. Rul. 76-28 to mean that the additional seven or eight payments deducted on its 1988 return were proper because "[a]ll [p]ayments to [d]efined [b]enefit [p]lans are [t]reated the [s]ame." Appellant's Br. at 35. It

emphasizes that contributions to defined-benefit plans are pooled. Unlike defined-contribution plans, defined-benefit plans do not segregate funds into individual employee accounts; the benefits ultimately received by an employee are fixed by the terms of the plan, and do not depend on the gains and losses on a segregated, individual account. From these characteristics, it reasons that _a fortiori_ all contributions to a multiemployer defined-benefit plan are "treated by the plan in the same manner."

We note initially that Rev. Rul. 76-28's "same treatment" requirement is hardly pellucid, notwithstanding American's reference to "[t]he plain meaning of Revenue Ruling 76-28." Appellant's Br. at 35. Whatever it means, it must mean more than the extremely narrow interpretation American has given it. There is no indication in the ruling that "same treatment" is limited only to certain purposes, or, specifically, that it refers only to the calculation of benefits. American offers no convincing reason why the calculation of employee benefits should completely control the question of the deductibility of employer contributions.

Rev. Rul. 76-28 demands that in order for an employer to deduct a payment as "on account of" its previous taxable year, the plan itself must treat the payment as though it were made on the last day of that taxable year. At the very least this means a multiemployer plan must so treat the payment for purposes of calculating compliance with § 413(b)(7), given that the very purpose of the "on account of"

-27-

requirement is to assign payments to particular time periods for purposes of maximum deduction limits. As we have explained in our analysis of the statute, this requirement was not satisfied, and therefore Rev. Rul. 76-28 supports our decision.

American protests that it is entitled to rely on any reasonable interpretation of a Revenue Ruling, relies on Technical Advice Memoranda and Private Letter Rulings as "conclusive evidence of reasonableness," Appellant's Reply Br. at 10, and cites Estate of McLendon v. Commissioner, 135 F.3d 1017 (5th Cir. 1998). First, as indicated above, American did not attempt to introduce most of this "evidence" at trial and subject it to analysis and rulings on admissibility by the Tax Court, and we will not consider it for the first time on appeal. In any event, American was not entitled to rely on the unpublished memoranda or rulings for an interpretation of a Revenue Ruling when receiving tax advice on how to plan its own tax strategy. [6] American offers no reason why it could not have applied for its own ruling. Second, the very fact that American argues for reliance on a "reasonable" interpretation of the Revenue Ruling demonstrates the weakness of its position. Taxpayers are not entitled to fashion their own beneficially strategic,

---

[6]Alleging the lone fact that other employers have obtained private rulings supporting deductions similar to those disallowed here, American argues that the IRS has imposed impermissibly disparate treatment. This is essentially a recasting of American's argument for reliance on private rulings, which we reject.

-28-

slanted interpretations.  Thus the case before us differs from McLendon , which involved a Revenue Ruling which, in the court's view, "state[d] a clear standard, expressed in language and example unneedful of further interpretation," and which "undeniabl[y]" supported the taxpayer's position.  135 F.3d at 1023. Third, even if Rev. Rul. 76-28 were crystalline, "Revenue [R]ulings do not have the force and effect of law, but rather are offered for the guidance of taxpayers, IRS officials, and others concerned; although they are entitled to some consideration, they do not control when contrary to statute or the expressed intention of Congress." Storm Plastics, Inc. v. United States , 770 F.2d 148, 154 (10th Cir. 1985);  see Dixon v. United States , 381 U.S. 68, 73-75 (1965).  Fourth, "neither the duty of consistency, nor the principles of equitable estoppel . . . preclude [the Commissioner] from correcting mistakes of law in the imposition and computation of tax liability, including the power to retroactively correct his rulings, regulations and decisions upon which taxpayers have relied." Massaglia v. Commissioner , 286 F.2d 258, 262 (10th Cir. 1961) (citing Automobile Club of Michigan v. Commissioner , 353 U.S. 180 (1957)).  We repeat the admonition of the Supreme Court:

> Even accepting the notion that the Commissioner's present position represents a departure from prior administrative practice, which is by

no means certain,[7] it is well established that the Commissioner may change an earlier interpretation of the law, even if such a change is made retroactive in effect. This rule applies even though a taxpayer may have relied to his detriment upon the Commissioner's prior position.

Dickman v. Commissioner, 465 U.S. 330, 343 (1984) (footnote & citations omitted). American's "taxpayer reliance" argument, which is essentially a dressed-up estoppel argument, runs counter to well-established law.

## c.

In clarification, we note that while we affirm the judgment of the Tax Court, and while we agree with much of its analysis and with its conclusion that American's position would frustrate the purposes of § 404(a) and § 413(b)(7), we

---

[7]American characterizes the IRS' administrative practice as "a consistent series of TAMs and PLRs spanning . . . decades" that "uniformly state [American's] position in this case, in every ruling, on every issue." Appellant's Reply Br. at 9, 10. The administrative history is not as clear as American claims, and certainly not clear enough to support any kind of reliance interest. First of all, by American's own count, only three private rulings squarely support its position—not exactly a decades-long history of consistent administrative practice. Second, one letter ruling cited by American applied Rev. Rul. 76-28 to approve deductions for post-taxable year contributions that were "treated by the [p]lans _for tax purposes_ in the same manner that the [p]lans would treat a payment actually received on the last day of [the taxpayer's preceding] taxable year." P.L.R. 80-42-133 (July 25, 1980) (emphasis added). Furthermore, many private rulings interpreting the "on account of" requirement and Rev. Rul. 76-28 are qualified by prominent references to the applicability of deduction limits. See, e.g., T.A.M. 85-43-002 (Apr. 30, 1985); P.L.R. 82-27-068 (Apr. 9, 1982); P.L.R. 80-42-133 (July 25, 1980). This reflects a subordination of the § 404(a)(6) grace period to the larger purpose of effective deduction limits, a view in tension with American's arguments.

disagree with its opinion to the extent it holds that American's grace-period deductions "fail[] to comply with the individual deduction limits of section 404(a)(1)(A) and section 413(b)(7)." American Stores , slip op. at 27. American correctly points out that there are no such "individual" limits under § 413(b)(7); limits are calculated on a planwide basis, and no planwide limit was exceeded here. However, it is precisely these mechanics of § 413(b)(7) which compel the conclusion that § 404(a)(6) contributions must be determined in a manner consistent with the calculation of anticipated contributions. Consequently, we agree with the Tax Court that American may not "includ[e] contributions in its tax year in a manner at odds with how anticipated contributions previously had been determined for the plan year in which [the last day of] its tax year falls." American Stores , slip op. at 29. This is not, however, because § 413(b)(7) itself disallows the deductions on an employer-by-employer basis; it is because American's interpretation of § 404(a)(6) would allow individual employers to distort the application of § 413(b)(7).

**d.**

In sum, although our reasoning differs in some respects, we follow the Tax Court and the Ninth Circuit in concluding that § 404(a)(6) provides no basis for

the bunching of deductions for scheduled contributions to multiemployer pension plans.[8] The deductions at issue here were properly disallowed.

## B. Vacation Pay

Under American's "General Plan," employees receive paid vacation in amounts corresponding to their years of service. The amount of vacation available to an employee during a particular calendar year is based on the number of years the employee will have worked as of the hiring anniversary contained in that year. During the calendar year in which employees reach the second anniversary of their hiring date, they may take two weeks of paid vacation; in the calendar year of the fifth anniversary, three weeks are allowed; and so on.

Those who have been continuously employed by the company during the prior calendar year may take the full amount of vacation for the current year at any time during the calendar year. They need not wait until the date of the hiring anniversary upon which the amount is based. However, employees who take vacation and then terminate employment prior to their hiring anniversary must repay that portion of the vacation pay corresponding to the time remaining until the hiring anniversary. For example, an employee hired in December 1986 could

---

[8]Because we agree with the denial of the deductions at issue, we need not reach the Commissioner's argument that American changed its method of accounting.

take two weeks of vacation in January 1988, but if that employee then quit in March 1988 the employee would have to repay approximately 3/4 of the vacation pay.

For the taxable years ending January 31, 1987, and January 30, 1988, American deducted the entire amount of vacation pay which its employees were allowed to take as of January 1 of each year, including that portion still subject to repayment requirements. The Commissioner disallowed deductions for that portion of benefits which employees would have to repay if they did not continue employment beyond the end of the taxable year. The Tax Court upheld the disallowance, holding that the benefits had not yet been earned by employees.

In defense of its deductions American cites former I.R.C. § 463,[9] which states in relevant part:

> (a) <u>Allowance of Deduction</u>.—At the election of a taxpayer whose taxable income is computed under an accrual method of accounting, if the conditions of section 162(a) are otherwise satisfied, the deduction allowable under section 162(a) with respect to vacation pay shall [include]
>
>> (1) a reasonable addition to an account representing the taxpayer's liability for vacation pay earned by employees before the close of the taxable year . . . .

---

[9]Section 463 was repealed by § 10201(a) of the Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, 101 Stat. 1330.

Such liability for vacation pay earned before the close of the taxable year shall include amounts which, because of contingencies, would not (but for this section) be deductible under section 162(a) as an accrued expense. . . .

American argues that vacation pay is "earned" as soon as employees are entitled to take it, and that the possibility of repayment is simply a contingency which would otherwise bar accrual but which does not affect deduction under § 463. [10]

We find this definition of "earned" unpersuasive. Earnings are not required to be repaid. The benefits at issue were at best advances or loans of vacation pay which employees were expected to earn during continued employment. Although it is clear from the statutory language that for purposes of deductibility Congress intended to disregard contingencies which would prevent earned benefits from being accrued, the possibility of repayment is not such a contingency. Rather,

---

[10]The Commissioner contends that American did not make this argument to the Tax Court and that therefore we cannot consider it. We disagree. Although American's argument here differs in emphasis from some of the arguments it made below, both the Tax Court and the Commissioner understood American's arguments to include the assertion that allowing employees to take vacation is sufficient to make that vacation "earned" and therefore deductible. The Commissioner argued that "[n]othing in the statutory language of I.R.C. § 463 or the legislative history . . . suggests . . . that a vacation pay accrual is considered to be 'earned' simply because the employer permits its employees to actually take vacations." R. Vol. II, Doc. 21 at 87. The Tax Court summarized the Commissioner's opposition to American's argument thus: "Respondent, on the other hand, contends that nothing in section 463 signals that vacation pay is earned simply because the employer permits its employees to take vacations." American Stores, slip op. at 40.

American's repayment requirement prevents the vacation pay at issue from being "earned" in the first place.

American notes that one of the contingencies which Congress expressly took into account in drafting § 463 was "termination of employment before vacation time arrives." S. Rep. No. 93-1357 (1974),     reprinted in  1974 U.S.C.C.A.N. 7478, 7479.  It contends that this shows that Congress intended to allow the deductions at issue here, where employees must repay advance vacation benefits if they terminate employment.

Contrary to American's claims, its position is not compelled by the legislative history it cites, and would undermine the requirement that vacation pay be earned in the year of deduction.  While we agree with American that § 463 permits a deduction for a category of vacation pay which may be characterized as "earned" but "contingent" on continued employment, the pay at issue is not such an amount.  Rather, such amounts would include vacation pay attributable to work done during the taxable year, but which employees were not eligible to take until after the end of the taxable year, and which they would lose if they were terminated prior to attaining such eligibility.

Thus we conclude that Congress intended to allow a deduction for vacation benefits corresponding to work done during the taxable year, whether or not employees were eligible to take the vacation during the taxable year, and even

though termination of employment before such eligibility might mean the employer would never actually pay those benefits. American's position is directly contrary, asserting deductions for vacation pay which employees were eligible to take during the taxable year but which corresponded to work done after the taxable year. We therefore find no support in § 463 for American's deductions.

Accordingly, the judgment of the United States Tax Court is AFFIRMED.